Filed 2/2/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S027094 |
| v. | ) | |
| | ) | Los Angeles County |
| MARCHAND ELLIOTT, | ) | Super. Ct. No. VA008051 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

Defendant Marchand Elliott[1] appeals from a judgment of death upon his conviction by jury verdict of one count of murder in the first degree (Pen. Code, §§ 187, 189),[2] with the special circumstance of murder during the commission of a robbery (§ 190.2, subd. (a)(17)). The jury found him guilty also of one count each of robbery (§ 211) and assault with a deadly weapon (§ 245, subd. (a)(1)), and it found that he personally used a handgun to commit both the robbery and the assault (§ 12022.5). At the penalty trial, the jury returned a verdict of death for the murder. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

---

[1] In the trial court, defendant's surname was incorrectly spelled as "Elliot." We have corrected the spelling and retitled the case accordingly.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

This appeal from the judgment of death is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I.  FACTS AND PROCEEDINGS

### A.  Prosecution's Guilt Phase Case-in-chief

#### 1.  Robbery and assault at Boys Market

Around 9:45 a.m. on October 31, 1988, an armored car driven by a man named Ramirez[3] stopped in the parking lot of the Boys Market on North La Brea Avenue, in Inglewood, Los Angeles County.  Joseph Swal, Ramirez's partner, got out to retrieve a shopping cart, which Ramirez then loaded with a box of coins and a canvas bag full of currency.  Pushing the cart, Swal entered the store and walked to the courtesy booth, where he delivered the coins and currency, receiving in exchange some clear plastic bags containing currency and coins.  Swal placed the plastic bags in the canvas bag, which he put in the shopping cart.  He walked toward the store exit, where he removed the canvas bag from the shopping cart.  As he was about to leave the store, Swal heard a mumbled voice, but he did not understand what was being said.  Continuing to walk, he heard the voice again and felt a gun pressed against his right temple.  The person holding the gun, who was identified at trial by a witness as defendant, said, "Drop it, drop it, drop the bag."

Swal dropped the bag.  Defendant said, "Get down, get down on the floor, get down."  As Swal was lying on the floor, defendant pulled Swal's revolver from its holster, picked up the canvas money bag, and started running toward the back of the store.  As he was running, defendant encountered a store employee, Pierre Jacobs, near the end of one of the store's aisles.  Defendant told Jacobs to "get

---

**3**    The record does not indicate the given name of Ramirez, who did not testify.

back," and Jacobs immediately dropped to the floor. As Jacobs was lying on the floor, he twice heard a sound he recognized as a gun's trigger being pulled, but no gun fired.

Holding a gun in each hand, and with the money bag tucked under his arm, defendant ran through the interior double doors leading into the store's warehouse area. Placing one gun against the right temple of Ardis Irvine, a store employee, defendant said, "Motherfucker, open the door now or I'm going to blow your damn head off." Irvine began rolling up the exterior warehouse door, but the door stuck. Defendant repeated his threat, pressed the gun harder against Irvine's head, and pulled back the hammer. When the door opened, defendant ran outside, jumped off the loading dock, and ran off. The store's manager, Wilson Colon, saw defendant run to a blue van waiting on Market Street. The van drove off after defendant entered on the passenger side. Colon reported the van's description and license number to the police.

Inglewood Police Officer Randy Goodro was driving a patrol car on the morning of October 31, 1988, when he received information about a robbery at a Boys Market on La Brea in Inglewood. The information included a vehicle description and license number. Around 10:30 a.m., Officer Goodro found a van matching the description in a carport behind an apartment building on North Market Street. The van, which had been reported stolen that day, was unoccupied and unlocked. After being examined for fingerprints, the van was impounded and towed.

### 2. Robbery and murder at Lucky Supermarket

Around 11:00 a.m. on December 15, 1988, an armored car driven by Howard Sands stopped near the front entrance of the Lucky Supermarket on Lakewood Boulevard in Bellflower. Since the store's opening, just eight days

3

before, the armored car had arrived every day around the same time. Patrick Rooney, Sands's partner, got out of the armored car and entered the store to make a delivery and a pickup. Michael Fiamengo, the assistant store manager, met Rooney at the store's safe. Rooney delivered payroll checks and cash, receiving in exchange $64,184 in cash and around $30,000 in checks, which he put in a canvas bag. As he walked back through the store to the front entrance, Rooney carried the canvas bag in his left hand and his gun, held by his side and pointing down, in his right hand.

As Rooney was about to exit the store, a man identified as defendant at trial by 12 witnesses rushed up behind Rooney, put his left arm around Rooney's neck, and shoved Rooney's head into the glass door, shattering it. At the same time, defendant pointed a gun, held in his right hand, at the right side of Rooney's head and fired one shot, killing Rooney. After grabbing the canvas bag and Rooney's gun with his left hand, defendant then ran back through the store to the warehouse area. As he ran through the store, defendant shouted: "Get the fuck out of my way. Everybody get the fuck out of my way." When he reached the warehouse area, defendant pointed his gun at Lawrence Diehl, a store employee. Defendant ran outside through the receiving doors and across the street to the corner of Palm Street and Virginia Avenue, where he stopped and waited. A van pulled up, defendant got in, and the van drove off.

At 11:35 a.m. the same day, in an apartment complex parking lot on Palm Street in Bellflower, Los Angeles County Deputy Sheriff Ronald Dietrich found a van matching the description of the one used in the robbery. The engine was running, but no one was in or around the van. The van had been stolen six days earlier after its owner had parked it on a street in the City of Rancho Cucamonga. A set of keys that the owner had left in the van was found next to Rooney's body

4

at the entrance to the Lucky Supermarket. After determining that the van had been stolen, Sergeant Dietrich impounded it.

The van and its contents, including a plastic container lid and a tabloid newspaper, were examined for fingerprints by Los Angeles County Deputy Sheriff Ronald George. He found and photographed five fingerprints that he determined were made by defendant. Two of the fingerprints were on the container lid; the other three were on the tabloid newspaper.

An autopsy revealed that Patrick Rooney died of a gunshot wound to the head, the bullet entering through the right temple. When it was fired, the gun was in loose contact with Rooney's temple.

Janet Delaguila, a Lucky Supermarket employee, was one of the witnesses who identified defendant at trial as the perpetrator of the robbery and murder of Patrick Rooney. She testified that two days before those crimes, on December 13, 1988, she had seen defendant in the Lucky Supermarket and had recognized him as a regular customer of Courtesy Cleaners, a dry cleaning store in Compton, where she had previously worked. During the two years she had worked at Courtesy Cleaners, she had seen defendant approximately three times each week. On December 13, defendant had been in the company of a woman, and they were pushing a shopping cart. When she next saw defendant, on December 15, 1988, he was running through the Lucky Supermarket carrying two guns, one in each hand, and a bag. On December 15, 1988, about an hour after the murder, a police officer took her to the dry cleaning store in Compton to search for a record with defendant's name. She remembered only that defendant's last name started with the letter "E." They looked at several months of receipts but did not find anything helpful.

**B. Defense Case at the Guilt Phase**

Fourteen persons who had been present at Lucky Supermarket when Patrick Rooney was killed testified as defense witnesses. Before trial, none of them had unequivocally identified defendant as the person who shot Rooney, and immediately after the crime they had described the perpetrator's appearance, hair style, and clothing in ways that were arguably inconsistent with descriptions given by other witnesses. On cross-examination, however, six of these witnesses identified defendant in court as the person they had seen at Lucky Supermarket that day shooting Patrick Rooney or running through the store immediately afterward with guns and a canvas bag. Of the remaining eight, one testified that defendant was definitely not that person, one testified that he could not identify defendant in court, although he had tentatively selected defendant's photo from a photo array, and the other six were not asked to make an in-court identification. Instead, those six individuals testified about viewing a live lineup in which defendant participated and/or viewing photo arrays that included defendant's photograph. Four of the six witnesses had not been able to identify anyone, one had identified someone other than defendant, and the remaining person had identified three different individuals, although she had not been positive as to any of them.

Peggy Patterson testified that she is defendant's aunt, that she saw him regularly before 1988, and that she never knew him to wear prescription eyeglasses. Modesto Ponce de Leon testified that he is the owner of Courtesy Cleaners, a dry cleaning store in Compton. Janet Delaguila, who testified for the prosecution, had been an employee at the store in 1987 and 1988. At the end of 1988, someone came to the store looking for some records, and Ponce de Leon provided the records he had. At that time, he kept sales receipts for only four or

6

five months, and some receipts had been thrown out after getting soaked during a heavy rain.

Denise Ahlrich testified that on December 15, 1988, she had been working at Denny's Restaurant in Bellflower, which shares a parking lot with Lucky Supermarket. Shortly before 11:00 a.m. that day, after she had seen police cars and heard sirens at Lucky Supermarket, a Black man entered Denny's and went straight to the men's bathroom. A short while later, he left the bathroom, walked out of the restaurant, and got into a white van. Ahlrich wrote down the van's license number. About 15 minutes later, the van drove out of the parking lot. She reported her observations to the police. Three years later, in December 1991, she selected defendant's photograph from a photo array as being the person she had seen at Denny's.

Scott Fraser, a professor of psychology, testified as an expert on eyewitness identification. Research studies indicate that the accuracy of an identification depends on the duration of the viewing, whether it was cross-racial, and how stressful the circumstances were. Memory of a visual observation deteriorates rapidly during the first four to six hours, and more gradually thereafter.

Four Los Angeles County deputy sheriffs testified about their interviews with various individuals at Lucky Supermarket on December 15, 1988. Deputy Dennis Flinn testified that he interviewed Howard Sands, the driver of the armored truck. Sands said he saw the shooter leave the store through the front entrance, get into a brown Toyota car, and drive away toward Palm Street. Deputy James R. Smith testified that he interviewed Debbie Van Sluys, who testified as a defense witness as trial. She told him she had heard a gunshot, saw a male Black suspect wearing a light-colored jacket, then turned away and hid and saw nothing else. Deputy Dieter Gerlach testified that he spoke to Michael Fiamengo, a prosecution witness at trial. Fiamengo described the hair of Patrick Rooney's killer as "short

natural." Deputy Sheriff Michael Miltimore had interviewed Cheryl Pitzer, a prosecution witness, and Cynthia Chikahisa, a defense witness. Pitzer said she had only seen the shooter's right-side profile and was unsure she could identify him. Chikahisa described the shooter as a light-skinned Black male with a slim build and short black hair.

Los Angeles County Deputy Sheriff John Charles Shannon testified that on December 15, 1988, at Lucky Supermarket in Bellflower, he drew sketches of Patrick Rooney's killer based on descriptions given by various witnesses, including Janice Maier, who testified at trial as a defense witness. Usually Shannon continues making changes in a sketch until a witness is satisfied with it, but sometimes he is unable to produce a sketch that satisfies a witness. Shannon did not remember whether Maier was satisfied with the sketch he drew at her direction. She testified that she was not satisfied with the sketch.

**C. Prosecution's Penalty Phase Case in Aggravation**

*1. Robbery and shooting at Hughes Market*

On December 29, 1987, Augustus Guardino was working as assistant manager of the Hughes Market on National Boulevard in Los Angeles. Shortly before 8:00 a.m., Guardino removed from the store's safe a bag containing the store's receipts from the previous day. Following his usual procedure, he began walking toward the store's cash office, where the store's receipts would be counted in preparation for their pickup by an armored transport service. As he passed one of the store's aisles, he saw a man whom he identified at trial as defendant pointing a gun at him. Guardino jerked his head back, defendant fired the gun, and Guardino fell to the floor, having been shot through the face. Defendant fired two shots in the direction of the store's exterior doors, grabbed the bag from Guardino, and ran through the store. After pushing a door open,

8

defendant went outside, ran through the parking lot, jumped a fence, and got into a car that sped off.

Guardino was not killed, but the bullet, which entered just below his right eye and exited near his left temple, destroyed his left eye, both cheekbones, and part of his upper jaw.

### 2. *Firearm possession*

On June 25, 1988, Los Angeles County Deputy Sheriff John Kuhn was on patrol duty in the City of Lakewood. As he was standing on a sidewalk, defendant and three other men walked toward him. Because he was investigating a report of "suspicious [B]lack males," Deputy Kuhn told the men to put their hands on the hood of Kuhn's patrol car. The other three men did so, but defendant did not. Defendant accused Kuhn of harassing them. Saying he had identification that would prove he was a good person, defendant started to reach for his left rear pocket with his left hand. Deputy Kuhn told defendant to keep his hands in front of him. Talking rapidly, defendant tried several more times to reach his left rear pocket until finally Deputy Kuhn threatened to shoot defendant. At this point a backup officer arrived, and defendant cooperated by putting his hands on the hood of the patrol car. In defendant's left rear pocket, Deputy Kuhn found a loaded revolver with a two-inch barrel. Defendant's wallet, containing his driver's license, was in defendant's right rear pocket.

### 3. *Robbery and shooting at Bank of America*

On December 5, 1988, at 12:45 p.m., Hojatola Danai Bouroumand was about to enter the Bank of America on Foothill Boulevard in the City of Rancho Cucamonga, San Bernardino County. In his left hand, Bouroumand carried a zippered pouch containing around $5,000, which he intended to deposit. As he was entering the door to the bank, someone from behind grabbed the pouch.

9

Bouroumand turned around and immediately was shot in the hand. The shooter took the pouch, ran to a white van, and got in on the passenger side. As a result of the gunshot, three fingers on Bouroumand's hand were seriously injured. Defendant admitted being the shooter by pleading guilty to second degree robbery.

### 4. *Robbery of Robert Reynolds*

On March 11, 1989, around 4:27 p.m., Robert Reynolds was sitting in his van, which was parked near a market in the City of Ontario, San Bernardino County. Reynolds had just purchased groceries and was preparing to drive home when he was approached by a man he later identified in court as defendant. Defendant said, "Get the fuck out of the car." Reynolds said, "What's your problem?" Pulling a gun from his belt and pointing it at Reynolds, defendant said: "Get the hell out of the car. Leave the keys there." After putting the keys on the van's floor, Reynolds got out. Defendant got in and tried to start the engine, but he appeared to be having difficulty. Noticing that defendant had put the gun down, Reynolds punched defendant on the left side of his face. Defendant picked up the gun, and Reynolds heard it fire. Reynolds then ran inside the market.

Christopher Thomas, who had observed these events from across the street, saw defendant get out of the van, holding a gun. Defendant ran away, with Thomas following at a distance. At one point he noticed that defendant was holding his leg as he ran. Eventually police officers arrived and took over the pursuit. They found defendant, with a bullet wound in one leg, hiding in some bushes by the fence line of a residence. In the backyard of another residence nearby, they found the gun that defendant had apparently discarded during his flight.

## 5. Victim impact

The parties stipulated that a woman present in court was Rebecca Rooney and that she was the wife of Patrick Rooney, the armored transport guard whom defendant killed during the robbery at the Lucky Supermarket.

## D. Defense Penalty Phase Case in Mitigation

### 1. Robbery and shooting at Hughes Market

The defense presented testimony to cast doubt on defendant's identity as the person who robbed and shot Augustus Guardino on December 29, 1987, at the Hughes Market in Los Angeles.

Los Angeles Police Detective Thomas Villalobos interviewed Guardino at the hospital on December 29, 1987. Guardino described the shooter as a male Black, late 20's to early 30's, wearing a knit cap. Los Angeles Police Officer Michael Gannon interviewed Guardino twice. Guardino told him the shooter was shorter than five feet 11 inches and that he had a thin mustache and a dark, mole-like coloration on the right side of his mustache. In November 1988, Guardino told Los Angeles Police Detective Peter Waack that on a television news broadcast, and also in a local newspaper called the Daily News, he had seen pictures of the person who had shot him. A law clerk working for defendant viewed microfilm copies of the Daily News published between November 21 and November 30, 1988, looking for articles about armored car robberies that included pictures. He found only one such article, which included a photograph of a composite sketch.

Daniel Lopaze, who saw the shooting of Augustus Guardino, described the shooter as a Black man, around five feet nine inches tall, weighing 145 to 150 pounds, with short hair. The shooter was not wearing a cap. Robert Davis also witnessed the shooting. Afterwards, he met with an artist who drew a picture of the shooter at his direction. He told the artist that the shooter had a mustache and

11

wore a knit watch cap. Fernando Ponce, a police composite artist, identified a sketch of the shooter that he had prepared in January 1988 at the direction of Robert Davis. In his opinion, defendant resembled the sketch.

## 2. *Defendant's character and family background*

Defendant's parents, Orie and Brenda Elliott, also had two other sons. Defendant, their middle child, was born on March 25, 1968. As a child, defendant was quiet and shy. When defendant was five or six years old, Orie and Brenda separated and divorced. Thereafter, defendant "seemed to be a little withdrawn." Orie did not provide regular financial support for Brenda and their sons, but he gave money when he could. Brenda worked during the evenings, leaving defendant and his brothers at home alone. After the separation, Orie had only infrequent contact with Brenda and their sons until defendant was 10 or 12 years old, when Orie began visiting once a week. Orie and Brenda tried to reconcile, but it did not work out. On two or three occasions when Orie came to visit, he found defendant at home when he should have been in school. Defendant did not graduate from high school.

In 1987, when defendant was 19 years old, Paul Burns, a friend and coworker of defendant's father, helped defendant get a job as a baggage handler at United Express, a commuter airline. Defendant was dismissed after three months because on his application he had falsely claimed to have graduated from high school. While the job lasted, defendant came to work on time, did his job, and got along with the other workers. Defendant later got some other jobs, but none lasted very long.

Jacqueline Elliott was married to defendant's older brother. She met defendant when he was 15 and she was 17 years old. She never saw defendant use

12

illegal drugs or act violently.  In 1988, she did not see defendant with new clothes, gold jewelry, or new cars.

Michael Alverson was defendant's next-door neighbor in 1986 and 1987, when defendant, who lived with his mother and his brother, was around 17 to 19 years old.  During that time, Alverson saw defendant almost daily.  Defendant "seemed to be a very nice young man" and seemed very happy with his job at United Express.

During the summer of 1988, defendant visited his maternal grandparents in Texas to look for employment, but he was unable to find a job.

Efram Cater lived in the same apartment complex as defendant from late 1983 to 1988.  They were close friends.  Cater never saw defendant use drugs or alcohol.  Defendant held several different jobs during that time.  Defendant did not seem to have a lot of money to spend in 1988.

Wilbert Harris met defendant around the beginning of 1987 and they became friends, seeing each other a few times a week, mostly on weekends.  They went to clubs together to dance and talk to girls.  Harris never saw defendant use drugs or alcohol or become violent.

### 3. *Prison security conditions*

James Park, a retired prison administrator, described the security classification and corresponding security precautions for prisoners serving sentences of life imprisonment without possibility of parole in California's state prisons.  Such prisoners, who are classified as Level IV, are housed in prisons with double fences topped with razor-ribbon concertina wire and gun towers with armed guards every 700 feet.  The perimeters of these Level IV prisons have never been breached.  Level IV prisoners work in prison industries, which reduces the cost to the taxpayers.

13

### 4. *Employment expert*

James H. Johnson, a geography professor, testified to a "massive decline in manufacturing level jobs" in Los Angeles, and a correspondingly high unemployment rate among young Black men, during the 1970's and 1980's. Many young Black men turned to illegal activities after unsuccessful attempts to find work.

### 5. *Forensic psychologist*

Robert L. White, a forensic psychologist in private practice, interviewed defendant and his brothers, his parents, his cousin Lisa Gaines, his sister-in-law Roshand Elliott, his aunt Peggy Patterson, and his maternal grandmother. Based on those interviews, he formed the opinion that during defendant's childhood, his home environment lacked discipline and structure. Often there was no adult supervision. As a result, important values were not transmitted to defendant, and he became accustomed to receiving everything he wanted from his parents. The dismissal from his job at United Express caused defendant great distress and frustration. Defendant then fell under the influence of persons engaged in "heavy-duty criminal activity."

### 6. *Other evidence*

On January 1, 1988, Long Beach Police Officer Larry Brown arrested and searched defendant, but he found no money. Los Angeles Police Detective John Yarbrough, who was the investigating officer for the murder of Patrick Rooney during the December 1988 Lucky Supermarket robbery, was not aware that any picture of defendant was published in any of the news media between November 20 and November 28 of 1988. Dwight Van Horn, a qualified firearms examiner, test-fired the gun found after defendant's arrest for the March 1989 robbery of Robert Reynolds. He determined that the gun did not fire a bullet recovered from

14

the parking lot of the Lucky Supermarket after the December 1988 killing of Patrick Rooney at that market.

Defendant was incarcerated in the Los Angeles County jail from July 25 to October 12, 1988. A person named Steven Young, who was born on September 17, 1959, is five feet seven inches tall and weighs approximately 140 pounds. Defense penalty phase exhibits E and F are photographs of Jeffrey Young, the brother of Steven Young. (The defense argued that Steven or Jeffrey Young committed the October 1988 Boys Market robbery and the December 1988 Lucky Supermarket crimes.)

## II. PRETRIAL AND JURY SELECTION ISSUES

### A. Denial of Severance Motion

Before trial, defendant unsuccessfully moved to sever the charges relating to the October 1988 Boys Market robbery from those relating to the December 1988 Lucky Supermarket robbery, so that those charges would be tried separately.[4] Defendant contends that in denying this motion the trial court applied the wrong standard, abused its discretion, and denied him his federal constitutional right to due process of law. We disagree.

Under section 954, "[a]n accusatory pleading" may charge "two or more different offenses of the same class of crimes or offenses, under separate counts." Here, as defendant has conceded both in the trial court and now on appeal, the

---

[4]   When he brought the motion to sever, defendant was charged, for the October 1988 incident at the Boys Market, with the attempted murder of Pierre Jacobs and assault with a firearm on Ardis Irvine. For the December 1988 incident at the Lucky Supermarket, defendant was charged with the murder of Patrick Rooney and the robbery of Patrick Rooney. Although defendant originally had been charged with the October 1988 robbery of Joseph Swal at the Boys Market, the trial court dismissed that charge under section 1387.1 because the prosecution had refiled it after it had twice previously been dismissed.

15

charged offenses relating to the two market robberies are all crimes of the same class, and thus they meet this statutory requirement for joinder. Section 954 also provides, however, that the trial court, acting "in the interests of justice and for good cause shown, may in its discretion order that the different offenses . . . be tried separately." In exercising that discretion, a trial court should consider (1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether some of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case. (*People v. Cook* (2006) 39 Cal.4th 566, 581.)

Arguing that the trial court applied the wrong standard when ruling on the motion to sever, defendant relies on one particular statement that the trial court made during the hearing on defendant's severance motion. Before considering that statement, we review the context in which it was made.

At the beginning of the hearing on defendant's motion to sever, after saying that it had read the points and authorities submitted by both sides, the trial court asked defense counsel if there was anything he wanted to add. Defense counsel said he wanted to inform the court of "one additional problem" with the Boys Market robbery case. The defense had hired an expert to examine fingerprints lifted from a shopping cart at the robbery scene, but the defense then had learned that the fingerprints could not be located. Defense counsel said that "at this point we can't say we could even answer ready until we get an answer on those prints" and that "[w]e might have a *Trombetta/Youngblood* motion to make on that case." (See *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*); *Arizona v. Youngblood* (1988) 488 U.S. 51.) Defense counsel then addressed the four factors that a trial court is to consider in exercising its discretion on a motion to sever.

16

In response, the prosecutor said that although the fingerprint evidence had not been located, "chances are we will find [the evidence] later today." The prosecutor was waiting to speak with the officer who had most recently had custody of the prints, to determine what he had done with them. The court and counsel then engaged in further discussion about the severance factors, including the defense argument that the prosecution had joined a weak case (the Boys Market attempted murder and assault) with a strong case (the Lucky Supermarket robbery and murder).

At the end of the hearing, the trial court made the remark that, according to defendant, shows that the court used the wrong standard: "[I]f there is a serious issue where there is a *Trombetta* or *Hitch*-type motion [see *People v. Hitch* (1974) 12 Cal.3d 641], that would have to be entertained here; and that could be — could result in that other case being dismissed." Immediately after making that remark, the court said that "[i]f there was mishandling or misconduct as far these prints were concerned, then that's a whole new issue." The court added that this "whole new issue" was not then before it and that the prosecutor had indicated that the matter could probably be resolved.[5]

Nothing in the trial court's remarks shows that it mistakenly considered the fingerprint issue relevant to the merits of the severance motion, or that it used an incorrect test for deciding that motion. On the contrary, the court's remarks show that it was aware of the four relevant factors in question and that it considered those factors in exercising its discretion by denying the severance motion. We therefore reject defendant's argument that the trial court applied the wrong legal standard when ruling on the severance motion.

---

[5]     The next day, the prosecutor told the court that the missing fingerprint evidence had been found.

We next consider defendant's argument that the trial court abused its discretion in denying the severance motion. A defendant claiming such an abuse of discretion must make a clear showing of prejudice. (*People v. Mendoza* (2000) 24 Cal.4th 130, 160.) We review the trial court's exercise of discretion in light of the record before it when it ruled. (*Id.* at p. 161.)

The first step in the analysis is to determine whether evidence of the various charges arising from the two incidents would have been cross-admissible in separate trials. The Attorney General does not argue that the evidence here would have been cross-admissible, and therefore we will assume, without deciding, that the evidence would not have been. But "evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together . . . ." (§ 954.1; see *People v. Cook*, *supra*, 39 Cal.4th 566, 581; *People v. Mendoza*, *supra*, 24 Cal.4th 130, 161 ["the absence of cross-admissibility does not by itself demonstrate prejudice"].)

To discharge his burden of showing prejudice from the joinder of the charges arising from the two incidents, defendant must show that one of the charged offenses was substantially more inflammatory than the other or was supported by significantly stronger evidence. (*People v. Price* (1991) 1 Cal.4th 324, 389.) Defendant has shown neither. The prosecution's evidence for the two market robberies was similar, relying primarily on eyewitness testimony, and roughly equivalent in strength. Although only the Lucky Supermarket robbery involved a murder, during the Boys Market robbery defendant placed the barrel of a gun against a store employee's head and threatened to kill him if he did not immediately open the store's exterior warehouse door. In this way, the two market robberies involved criminal conduct that was similarly egregious. (See *People v. Soper* (2009) 45 Cal.4th 759, 781; *Alcala v. Superior Court* (2008) 43

18

Cal.4th 1205, 1227.) We conclude that defendant did not make a sufficiently compelling showing of prejudice to require severance. Therefore, the trial court did not abuse its discretion in denying defendant's severance motion.

Finally, we consider defendant's argument that joinder of the charges relating to the two market robberies "actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People v. Arias* (1996) 13 Cal.4th 92, 127.) The evidence offered to prove defendant's guilt of the various charges arising from the two incidents was "relatively straightforward and distinct," while the evidence relating to each charge was "independently ample" to support defendant's conviction on that charge. (*People v. Soper*, *supra*, 45 Cal.4th 759, 784.) The testimony of one or more eyewitnesses identified defendant as the gunman involved in each incident. (See *People v. Cook*, *supra*, 39 Cal.4th 566, 583.) Considering defendant's trial as a whole, we conclude that it was not grossly unfair, and thus that the joinder of the charges relating to the two market robberies did not result in a denial of due process.

## B. Statements Regarding Costs of Punishments

Defendant contends that during jury selection the trial court and the prosecutor gave prospective jurors incorrect and irrelevant information about the costs incurred by the government to impose the death penalty in a particular case as compared to the costs of imposing a sentence of life imprisonment without the possibility of parole. The claim lacks merit.

The questionnaire that prospective jurors were required to complete included this question: "Without having heard any evidence in this case, what are your general thoughts about the benefit of imposing a death sentence of [*sic*] a criminal defendant?" In response to this open-ended question, some jurors wrote that they thought, or had heard, that the death penalty costs less than life

19

imprisonment.  During voir dire, defense counsel was the first to raise the issue, asking whether, in deciding penalty, a prospective juror would "think about economics, how much it cost to keep a person alive for the rest of their lives." The prosecutor also explored the issue on voir dire, but she cautioned the jurors that the cost of housing a defendant was not one of the circumstances they would be allowed to consider in reaching the penalty verdict.  The trial court likewise cautioned prospective jurors to "put it out of your minds" because any difference in the state's costs to administer the death penalty, as compared to life imprisonment, was "not one of the factors that you're allowed to consider in determining the question of life or death."

In this context, the trial court and the prosecutor here made the remarks of which defendant now complains.  In questioning a prospective juror who said she had "heard conflicting statements" on which penalty was cheaper for the state, the prosecutor said that "on the one hand, if a person has life without [parole], and the state is supporting them for the rest of their lives, on the other hand if they have a death penalty, the court is paying for their appeals and we're paying for them to be alive and we're paying for their lawyers, and the appellate process, and whatnot, would you say it about evens out?"  The defense did not object to this remark, which the prosecutor immediately clarified by cautioning that penalty-administration costs were not a factor that the jurors would be permitted to consider in determining penalty.

The trial court, directly before it cautioned the jurors that costs of punishment could not considered in determining penalty, stated that "financially, to put this to rest, without going into a great deal of detail, there isn't an awful lot of difference between the cost to the State in a death penalty and a life without possibility of parole case."  The defense did not object to this remark.

20

To preserve for appeal a claim of prosecutorial or judicial misconduct, a timely objection and a request for a jury admonition is required. (*People v. Lee* (2011) 51 Cal.4th 620, 646 [prosecutorial misconduct]; *People v. Seaton* (2001) 26 Cal.4th 598, 635 [trial court misconduct].) Because he did not object to these remarks by the prosecutor and the trial court, and an admonition would have cured any harm, defendant has forfeited his misconduct claims. Had the claims not been forfeited, we would reject them on the merits. The court and the prosecutor correctly advised the prospective jurors that in deciding the penalty issue, if the case reached the penalty stage, they would not be permitted to consider the respective government costs of the death penalty and life imprisonment without parole. Telling the prospective jurors that the costs would "even[] out," and that there was not "an awful lot of difference" between the costs, could only further diminish the possibility that jurors would be tempted to allow cost considerations to influence the penalty decision. For this reason, those remarks could not have prejudiced defendant.

### C. Voir Dire Implying Threat to Juror Safety

During voir dire, a prospective juror who ultimately was not selected as a juror or an alternate said that he had been the victim of a crime, and that he had reported the crime but later "dropped the charges." He explained: "I feel I did the right thing, because I was in a position where I was going to be hurt if I — if I kept on with it, you know. It was too close. I had a barber shop, and the young kids, you know, were — lived too close to the barber shop, and I was a target there."

The prosecutor followed up with this question: "Let me ask you something hypothetically, and I think you will see what my point is. Once again, this has absolutely — I cannot stress this enough. This has absolutely nothing to do with

21

this case.  [¶]  Let's say you sat on a jury, and you perceived — as you were sitting on the jury listening to evidence and everything, you perceived some danger to yourself in coming back with a verdict one way or the other.  [¶]  Would that affect your decision?"

The defense promptly objected, and the trial court sustained the objection, stating:  "That situation is not going to exist.  There is no reason to feel it would exist.  Therefore, it is not an appropriate inquiry in the context of this case, the fear that someone may have a result because of — in a neighborhood of being terrorized is completely divorced from what the situation is in this courtroom. There isn't a person on this jury who has the slightest reason to fear any consequence as a result of their jury service."

Defendant contends the prosecutor committed misconduct by asking a question that implied the existence of a threat to the safety of jurors in this case. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]  Under California law, a prosecutor who uses reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair.  [Citation.] Generally, a claim of prosecutorial misconduct is not cognizable on appeal unless the defendant made a timely objection and requested an admonition." (*People v. Doolin* (2009) 45 Cal.4th 390, 444.)

Because defense counsel objected, and the trial court admonished the prospective jurors who were present in the courtroom, the prosecutorial misconduct claim is cognizable, but it fails on the merits.  Here, a prospective juror admitted that he had previously dropped criminal charges out of fear for his safety.  Given that admission, the prosecutor was understandably concerned that the prospective juror's fears might in some way affect his ability to discharge his

22

duties as a juror.  Seeking to explore the issue, the prosecutor couched her inquiry in terms of a hypothetical situation, saying she could not stress enough that it had nothing to do with this case.  The trial court promptly sustained the defense objection and vigorously admonished the prospective jurors that no one had "the slightest reason to fear any consequence as a result of their jury service."  This was an isolated incident; the prosecutor did not pursue a similar line of inquiry with any other prospective juror.  Considering all these circumstances, the risk of prejudice to defendant was insignificant, and therefore defendant has not shown prosecutorial misconduct.

### D.  Voir Dire Affecting Jurors' Sense of Responsibility

Defendant contends that during voir dire the trial court and the prosecutor made comments that diminished the jurors' sense of responsibility for the sentencing decision.  We disagree.

Defendant relies on *Caldwell v. Mississippi* (1985) 472 U.S. 320 (*Caldwell*).  There, the prosecutor told the jurors during argument that if they returned a death verdict their decision would be reviewed by the Mississippi Supreme Court.  The United States Supreme Court reversed the penalty determination, holding that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  (*Caldwell*, at pp. 328-329.)  The high court has since clarified that *Caldwell* error occurs only when the remarks to the jury concerning its role in the sentencing process are inaccurate or misleading in a way that allows the jury to feel less responsible than it should for the sentencing decision.  (*Romano v. Oklahoma* (1994) 512 U.S. 1, 9; see *People v. Murtishaw* (2011) 51 Cal.4th 574,

592; *People v. Collins* (2010) 49 Cal.4th 175, 232; *People v. Avila* (2009) 46 Cal.4th 680, 721.)

The first incident of which defendant complains occurred during the voir dire of Prospective Juror E.L., who had written on her questionnaire that in an appropriate case she could vote for a death sentence, but who, when questioned by defense counsel during voir dire, said she could never do so.  Seeking clarification, the trial court asked her:  "Did you misspeak in the questionnaire, or have you changed your position?"  E.L. replied:  "I think is [*sic*] not my position to do that decision.  I think is your — is the judge, you know.  That's what I think about it."

Defendant faults the trial court's response, which was this:  "Let me clarify that, as well.  Nobody is going to have to impose the death penalty, *but the jury has to make the decision*.  Nobody is going to tell you what to do.  Nobody is ever going to tell you [that] you have to impose the death penalty or you have to impose life without the possibility of parole, or decide on the death penalty or decide on life without the possibility of parole.  [¶]  If the jury comes back with a sentence of death, then at a later time it would be my responsibility to actually impose a death sentence, to actually say the words, just as it would be my responsibility to say the words 'life without possibility of parole.'  *But in order to prompt the words that I say, it's your decision.*"  (Italics added.)

In arguing that this remark by the court improperly diminished the jury's sense of responsibility for the sentencing decision, defendant ignores the words that we have italicized.  The prospective jurors present in the courtroom would understand from the quoted remarks that although it was the responsibility of the court, and not the jury, to actually pronounce the sentence, it was indeed the jury's responsibility to determine which sentence — death or life imprisonment without possibility of parole — the court would pronounce.  The court's remark was neither inaccurate nor misleading, much less was it misleading in a way likely to

24

diminish the jurors' sense of responsibility for the sentencing decision. Consequently, there was no *Caldwell* error.

The other voir dire incident on which defendant bases his *Caldwell* error claim occurred later the same day. Prospective Juror K.T. had written on her questionnaire, in response to a question asking for her opinion about the death penalty, that it "must not be based on circumstantial evidence." The prosecutor told her that if she were selected to be on the jury, the trial court would instruct her that "circumstantial evidence is just as good as direct evidence," and asked K.T. what she thought of that. K.T. answered that around 12 or 14 years before, when she was in college, she had performed research on the death penalty and had found "numerous cases where people had been put to death" but later "they found they weren't guilty."

The prosecutor responded: "Let me tell you here, because you're addressing a concern that the judge is going to tell you now we have laws set up, and we have all these safeguards and procedures in place. [¶] We have this kind of a system, things that have developed and evolved over the last 20, 30, 40 years that weren't in place possibly when you did these studies and did all of that. [¶] And these are all things — this is why we're going through all of this, and this is why the People have a certain burden. This is why the burden is on the People, and all these things. And in the State of California you'll find that the laws are different than in other states, where maybe they don't have as many safeguards as they do here."

Defense counsel objected that the prosecutor was "sort of preinstructing and making a personal statement." The trial court replied: "Well, I think the whole problem is a misunderstanding about circumstantial evidence. [¶] Because sometimes people say, well, it's only circumstantial evidence, and they don't — they don't realize how much circumstantial evidence is used and relied on all the

time.  [¶]  To give you a very homely example, if you look at your gas gauge and it says you have a quarter tank of gas, that's circumstantial evidence.  You haven't smelled the gasoline or stuck a stick in to see what you really have in the tank.  You just accept the gauge.  The gauge may or may not be right.  [¶]  We have all these cautionary things about circumstantial evidence.  We say if the evidence is equally susceptible to two interpretations, one of which points to innocence and the other to guilt, you have to adopt that interpretation which points to innocence and reject the one that points to guilt; but if the interpretation of circumstantial evidence is unreasonable, then you reject the unreasonable and accept the reasonable.  [¶]  We do have many safeguards in place; and as far as the evidence [is] concerned, that's what my job is, to screen the evidence so that all you hear in a trial is what is competent and what is acceptable evidence from both sides.  Regardless who presents it, the same rules obtain.  [¶]  I don't want you to be fooled that in making determinations in this case that you have to be concerned about some remote possibility, because this was mentioned earlier.  Even in our definition of beyond a reasonable doubt, we have to set some sort of limits.  We have to say the law does not require the People to prove a case beyond all possible doubt because that degree of proof is rarely possible.  [¶]  But what is required is evidence that is so convincing that it leaves your mind in that condition that you can say you feel an abiding conviction to a moral certainty of the truth of the charge.  That's a reasonable doubt.  And if the proof doesn't come up to that point, then you find the defendant not guilty or find the point to be proved not true.  [¶] So I really don't think that is a concern that you have to be worried about in this courtroom."

Defendant argues that the prosecutor and the trial court committed *Caldwell* error by telling the prospective jurors, some of whom were later selected, that "California has special safeguards that prevent the system from executing an

26

innocent person" and by "instilling the false belief that an innocent man cannot be executed in California." We disagree. The trial court correctly informed the jury about the rules governing circumstantial evidence and correctly informed the jury about the governing standard of proof beyond a reasonable doubt, and it assured the prospective jurors that the rules of evidence and the standard of proof provided adequate safeguards against conviction and execution of the innocent. Defendant identifies nothing in these remarks that was inaccurate or misleading in a way that would allow the jury to feel less responsible than it should for the sentencing decision. (See *Romano v. Oklahoma*, *supra*, 512 U.S. 1, 9.)

### E. Prosecution's Use of Peremptory Challenges

Defendant, who is African-American, contends that the prosecutor violated his federal constitutional right to equal protection (see *Batson v. Kentucky* (1986) 476 U.S. 79) and his state constitutional right to a representative jury (see *People v. Wheeler* (1978) 22 Cal.3d 258) by exercising peremptory challenges to exclude African-Americans and female Hispanics from the jury. During jury selection, defendant's counsel raised this issue by making four *Batson/Wheeler* objections, each of which the trial court overruled.

Such an objection, when raised at trial, is governed by these procedures and standards: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.) On

appeal, when reviewing a trial court's third-step determination on the ultimate issue of purposeful discrimination, we apply the deferential substantial evidence standard. (*People v. Lewis* (2008) 43 Cal.4th 415, 470.)

We examine each of the four *Batson/Wheeler* objections that defendant raised in the trial court.

### 1. *Prospective Juror P.J.*

Jury selection began with the excusal of prospective jurors who established that service would cause an unusual hardship. The prospective jurors remaining in the jury panel completed a 27-page questionnaire by answering 125 questions, one of which asked them to state their "race and ethnic origin." The prospective jurors were then divided into groups and examined on voir dire, during which the parties exercised challenges for cause. In the final phase, the names of the remaining prospective jurors were placed in a random order on a computer-generated list that was provided to counsel. After the first 12 prospective jurors on the list were seated in the jury box, both parties proceeded to exercise peremptory challenges against the seated jurors, with each side having 20 challenges. As each challenge was exercised, another juror was called in order from the list to occupy the seat of the juror removed by challenge. When the defense had exhausted its peremptories, and the prosecution had accepted the jury as then constituted (after exercising 17 of its 20 peremptories), the 12 jurors seated in the box were sworn to try the case. Four alternate jurors were then selected in the same manner, with each side receiving four peremptory challenges.

The prosecutor used her 10th peremptory challenge against Prospective Juror P.J., an African-American woman. The defense raised a *Batson/Wheeler* objection, noting that P.J. was the "only Black juror who has been called" into the jury box. The trial court asked the prosecutor to state her reason for the challenge.

The prosecutor answered: "May I see her questionnaire, and I'll tell you exactly why. [¶] I remember her. Because I felt that she was weak on death when I first read her. And I'm kicking off everybody that I feel — that I perceive as being weak on death from the questionnaire. [¶] And since we didn't — I realize I didn't get a chance to really talk to her because we were running at the end of the day. She appeared at the end of the day when we were talking to her. The defense never talked to her about death. [¶] So from — all we have as to her feelings on death is what she wrote in this questionnaire. And it's apparent from the questionnaire she's weak on death." Defense counsel did not dispute the prosecutor's statements, and the trial court overruled the defense objection, stating: "I think counsel is entitled to exercise her discretion in exercising the peremptories. And I'm satisfied from [the prosecutor]'s explanation that she is not excluding her because of race, but because of her answers to the questionnaire."

Because the prosecutor explained her reason for the peremptory challenge of Prospective Juror P.J., and the trial court ruled on the ultimate question of intentional discrimination, the issue of whether defendant made a prima facie showing is moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359; *People v. Booker* (2011) 51 Cal.4th 141, 165; *People v. Lewis*, *supra*, 43 Cal.4th 415, 471.) We therefore proceed directly to the third step of the *Batson/Wheeler* analysis.

Substantial evidence supports the trial court's finding that the prosecutor did not engage in purposeful discrimination by peremptorily challenging Prospective Juror P.J. On her questionnaire, when asked to describe her "opinion regarding the death penalty," P.J. wrote: "I feel a little uneasy with the death penalty, never really gave it a deep thought." Asked to describe her "opinion regarding life in prison without the possibility of parole," she wrote: "A little more comfortable with that . . . as it is not taking a life." In answer to another question, she wrote that she thought that life without parole was "worse for a

29

defendant" than death because "with death it's over — life in prison is like a living death." During voir dire, neither defense counsel nor the prosecutor directed any questions to P.J.

Given the questionnaire answers just quoted, the prosecutor could reasonably conclude that Prospective Juror P.J. would be reluctant to vote for the death penalty, regardless of the balance of aggravating and mitigating circumstances. P.J.'s written answers revealed that she was "uneasy" with the death penalty because it involved taking a life, while she would be "more comfortable" voting for life without parole because it did not involve taking a life. Moreover, she might vote for the penalty of life without parole on the rationale that it was actually more severe than the death penalty. A prospective juror's reluctance to vote for a penalty verdict of death is a permissible, race-neutral reason for exercising a peremptory challenge. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 472.)

Defendant argues that a comparison of Prospective Juror P.J.'s questionnaire answers with those of non-African-American prospective jurors whom the prosecutor did not peremptorily challenge demonstrates that the prosecutor's stated reason for striking P.J. was pretextual. Defendant's failure to make this argument in the trial court does not preclude our consideration of it on appeal, but "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." (*People v. Lenix* (2008) 44 Cal.4th 602, 622.) "One of the problems of comparative juror analysis not raised at trial is that the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges. When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors

30

even if those other jurors are similar in some respects to excused jurors." (*People v. Jones* (2011) 51 Cal.4th 346, 365-366.)

Defendant asserts that Prospective Juror P.J.'s questionnaire responses indicating reluctance to impose the death penalty were "substantively indistinguishable" from those of Jurors S.S., S.G., R.L., and C.G., none of whom were challenged by the prosecutor. S.S., S.G., and R.L. were impaneled on the trial jury; C.G. was selected as an alternate juror.

When asked by the questionnaire to express her "opinion regarding the death penalty," Juror S.S. wrote: "I don't know if I could sentence someone to the death penalty. I would have to weigh all the circumstances presented." Asked for her "opinion regarding life in prison without the possibility of parole," she wrote: "I am in favor of this, I believe this would be a lesser sentence than the death penalty." We agree that these answers imply a reluctance to impose the death penalty comparable to that implied by Prospective Juror P.J.'s answers to the same questions. Unlike P.J., however, S.S. viewed punishment by death as "worse for a defendant" than life imprisonment without the possibility of parole because "with life in prison they will continue to live the rest of their life behind bars." She affirmed that she would not automatically vote against the death penalty, and that she would "listen to all the facts." Asked again by defense counsel whether "there are some instances when you could vote for the death penalty," S.S. answered, "Yes." She also said that she had never thought about the death penalty before she came to court that week. During voir dire by the prosecutor, when asked whether she thought she could impose the death penalty if she "felt it was appropriate," S.S. answered, "Yes, yes, I do." Asked whether she thought that, with regard to penalty, "anybody is at a disadvantage with your frame of mind, someone with your frame of mind being on the jury," she answered, "No."

31

These voir dire responses, during which the prosecutor was able to evaluate Juror S.S.'s demeanor, together with her questionnaire response stating that she regarded death as a more severe punishment than life imprisonment without possibility of parole, sufficiently distinguish S.S. from Prospective Juror P.J.

Juror S.G., when asked for her "opinion regarding the death penalty," wrote on her questionnaire: "I don't think it serves its purpose — it is no punishment for the criminal, but for the people he leaves behind." Her opinion of life imprisonment without parole was that it "is more a punishment knowing you have to [spend] the rest of your life behind bars." Asked whether "death in the gas chamber is a severe punishment," she checked the box "No," adding, "I believe the person is punished while waiting to be put to death — but once dead there is no punishment." She thought life without parole would be "worse for a defendant" because "a person would hurt more by knowing he-she would never be free."

These questionnaire responses by Juror S.G. are similar in some ways to those of Prospective Juror P.J. Unlike P.J., however, S.G. did not express discomfort with the death penalty on the basis that it involved "taking a life." Rather, she expressed her reluctance entirely in terms of her view that death was less severe than life without parole because punishment would cease at the time of death. The prosecutor could reasonably regard that view, which S.G. reiterated on voir dire, as more favorable to the prosecution than the view of Prospective Juror P.J. Moreover, unlike P.J., who did not indicate on her questionnaire that she had any friends or relatives in law enforcement, S.G. wrote on her questionnaire that her husband was a detective employed by the Los Angeles Police Department, that she had "seen pictures on homicide cases my husband brough[t] home to work on," and that one of the "most important problems in the current criminal justice system" was that "some punishments are not severe enough." These responses

32

also distinguish S.G. from P.J. and provide a race-neutral explanation for the prosecutor's nonchallenge of S.G.

Juror R.L., on her questionnaire, described her "opinion regarding the death penalty" as "unsure." She provided the same one-word description of her opinion regarding life without parole. She considered life without parole "worse for a defendant" than death, but she provided no explanation for that view. These questionnaire responses differ significantly from those of Prospective Juror P.J. They do not indicate a reluctance to vote for the death penalty on the basis that it involves "taking a life." On voir dire, moreover, when asked why she wrote that she was "unsure" about her views on the death penalty and life without parole, R.L. gave this explanation: "I meant at this time I couldn't give you an answer as to would I or wouldn't I. I would have to hear all the facts before I could answer that question." When the prosecutor asked whether the questionnaire response meant that R.L. was unsure whether she "believed in the death penalty," R.L. answered, "Oh, no, no, no, no." She added: "I mean I could vote for the death penalty. I can vote against it. I could go either way depending on the circumstances and facts and the evidence." On further questioning, she said she "wouldn't favor one [penalty] over the other" and that she "look[ed] at them equally." These responses dispel any inference that R.L. would be disinclined to vote for the death penalty.

We consider, finally, Alternate Juror C.G. To describe her "opinion regarding the death penalty," she wrote: "I am not sure, never had to really think about it, depends on case." To describe her opinion of life without parole, she wrote: "Justice has been served." She indicated that she regarded death as "worse for a defendant" than life without parole, but she did not explain that answer. Unlike the corresponding questionnaire responses of Prospective Juror P.J., C.G.'s responses do not indicate discomfort with the death penalty because it involves

"taking a life." On voir dire, moreover, C.G. was able to clarify her views. She affirmed that, if called upon to do so, she would "feel comfortable in deciding" the penalty question, and that nothing about the case made her "feel one way or the other now." She said she regarded death as the "ultimate" punishment and that she would "look at the facts, the circumstances" and "read the testimony, everything." The prosecutor asked: "Could you ever see yourself voting to impose the death penalty in a case where you have been convinced of a defendant's guilt beyond a reasonable doubt, but you haven't been convinced of his guilt beyond all possible doubt?" C.G. answered, "Yes." Asked whether she felt "comfortable about that," she again answered, "Yes." These responses sufficiently distinguish Alternate Juror C.G. from Prospective Juror P.J. Also, C.G. wrote that her brother was a police officer in Los Angeles. This provided another reasonable basis for the prosecutor to regard C.G. as a more favorable juror than P.J.

### 2. Prospective Juror Mary G.

Immediately after overruling the defense *Batson/Wheeler* objection to the prosecution's peremptory challenge of Prospective Juror P.J., the trial court made this comment to the prosecutor: "I would, while we're here, sound a note of caution. I was a little alarmed that you exercised the first several peremptories on Hispanics. And it seemed to me there was a pattern developing there that you might have to explain somewhere along the line. [¶] But the same thing. The defense hasn't raised it. I just sound it as a note of caution. And I think that we should watch that."

Thus alerted, the defense raised another *Batson/Wheeler* objection when, shortly thereafter, the prosecutor used her 14th peremptory challenge against a Hispanic woman, Prospective Juror Mary G. Defense counsel noted that Mary G.

was the fifth Hispanic woman that the prosecutor had removed by peremptory challenge. Without stating whether it had found a prima facie case, the trial court asked the prosecutor why she had excused Mary G. The prosecutor replied: "Your Honor, [Mary G.], as I recall, from when she was on the stand yesterday, came very close to being a challenge for cause. [¶] She was sitting here — in fact I tried to challenge her for cause. She was sitting next to [F.R.], as I recall. And she — I thought I had her originally down for my questionnaire as a challenge for cause. If she had stuck to the answers when she was talked to, it would have gotten her kicked. But she changed her tune as soon as [F.R.] changed hers. So unless I got my people mixed up . . . ."

Without disputing the accuracy of the prosecutor's description of Prospective Juror Mary G.'s questionnaire answers and voir dire responses, defense counsel asked for an explanation of the prosecutor's previous challenges to Hispanic women. The trial court denied that request and overruled the objection. The trial court explained: "I think that counsel at this time has a very logical explanation. I remember the colloquy well with [Mary G.]. She was — waffled back and forth. And we had to go into great detail with her. And finally she qualified — I mean she passed cause by changing her position back again. [¶] And I'm sure you remember the same thing. We had to go back and forth with her. And I finally had to get into it. So I can't fault [the prosecutor] for having — since she said that she is exercising her challenges for people that she perceives to be weak on death, certainly this is a person that would be a loose cannon in the jury room as far as the prosecution is concerned."

In this instance, as with Prospective Juror P.J., the issue of whether defendant made a prima facie showing is moot because the prosecutor explained her reason for the peremptory challenge of Prospective Juror Mary G., and the trial court ruled on the ultimate question of intentional discrimination. (*Hernandez v.*

35

*New York*, *supra*, 500 U.S. 352, 359; *People v. Booker*, *supra*, 51 Cal.4th 141, 165; *People v. Lewis*, *supra*, 43 Cal.4th 415, 471.)  We therefore proceed to step three of the *Batson/Wheeler* analysis.

We acknowledge that, as defendant asserts, both the prosecutor and the trial court made statements that the record does not support.  The prosecutor was mistaken in stating that during voir dire Prospective Juror Mary G. "was sitting next to" Prospective Juror F.R., while the court was mistaken in stating that it "finally had to get into" the voir dire questioning of Mary G.  The record shows, instead, that Mary G. and F.R. underwent voir dire on the same day but at different times, and that the trial court did not participate in the voir dire of Mary G.  But factual mistakes of this sort are usually the result of faulty memory and "are not necessarily associated with impermissible reliance on presumed group bias." (*People v. Williams* (1997) 16 Cal.4th 153, 189; accord, *People v. Jones*, *supra*, 51 Cal.4th 346, 366.)  Moreover, as the record shows, the prosecutor was correct that Mary G. had "changed her tune" regarding her willingness to vote for death, and the trial court was correct that Mary G. had "passed cause by changing her position."

During voir dire, when defense counsel asked whether there was "anyone sitting here that would never vote for death," Prospective Juror Mary G. raised her hand.  Before asking Mary G. to explain her position, defense counsel questioned other prospective jurors who had also raised their hands.  One of those jurors, when asked whether she could vote for death for "the worst criminal you could ever think about," said she "couldn't do it."  At this point, defense counsel invited Mary G. to comment.  Mary G. said:  "I would say no, but it would be according to what the case is."  Asked by defense counsel whether she "could think of an instance or a situation and — where you would vote for the death penalty," Mary G. answered, "Yes."

36

Later, when the prosecutor's turn for questioning arrived, the prosecutor asked: "I am not quite sure what your position is — why don't you tell me a little bit about it — with regards to the death penalty." Prospective Juror Mary G. replied: "I am for it. Of course, depending on the case and the circumstances." Asked how she "would feel about having to judge somebody," Mary G. replied, "I would be judgmental." The prosecutor continued: "When you filled out your form, you left blank what your feelings were on the death penalty; but under the life without possibility of parole, you felt it was the most severe punishment due to the fact no one knows how long you will live. Do you still believe life without the possibility of parole is the more severe punishment of the two?" Mary G. replied: "I would say it would depend on each individual." The prosecutor said that "the law, it would appear, views death as a more severe sort of thing." Asked whether she understood that, Mary G. said, "Yes." Asked how she felt "about being told to do that," Mary G. replied, "I would say death."

These responses support the trial court's observation that Prospective Juror Mary G. was "a person that would be a loose cannon in the jury room as far as the prosecution is concerned." On her questionnaire, Mary G. had given no response at all when asked for her opinion about the death penalty. During voir dire, she raised her hand when defense counsel asked if any juror would never vote for death. That action alone would cause any reasonable prosecutor to question a prospective juror's willingness to vote for death in a case such as this one. Although Mary G. later said she could think of a situation in which she would vote for death, she did not say what that situation was. Mary G.'s responses were sufficient to avoid a challenge for cause, but the prosecutor had valid grounds for concern that Mary G. would not be a favorable juror for the prosecution on the penalty issue. The inconsistency and ambiguity of her responses also suggested she might have difficulty performing her duties as a juror. (See *People v. Taylor*

37

(2009) 47 Cal.4th 850, 893.) Substantial evidence supports the trial court's finding that the prosecutor's peremptory challenge of Mary G. was not racially motivated.

### 3. *Prospective Juror Myron G.*

The prosecutor used her 15th peremptory challenge to remove Prospective Juror Myron G., an African-American man. The defense renewed its *Batson/Wheeler* objection "based on the exclusion of Blacks from the jury." After remarking that it had no control over the number of African-Americans on the jury panel, the trial court asked the prosecutor to give her reasons for the challenge. The following colloquy ensued.

The prosecutor: "As to [Myron G.], first I wanted to take notice of — it can't be put on the record because it's a visual observation, which is [Myron G.] came into this courtroom each day dressed in T-shirts and jeans. He has his hair — *Williams*, I believe, one of the latest cases, talks about you can discuss the appearance of the jurors before even getting into the . . . . [¶] The man had his hair, which is an Afro, cut into a bun in the back. I couldn't make heads or tails of what kind — and he had his hair cut in little rows that went around his head. [¶] When he was up there, he wouldn't make eye contact with me. He wouldn't make eye contact with anybody. He wasn't paying attention."

Defense counsel: "I would take heed [*sic*] with her statement that he wasn't paying attention when he was in the box. I don't think the record indicates that. [¶] I paid close attention to him because I anticipated this man being preempted because he was the only [B]lack male in this venire, of these 75 people. I paid close attention to his answers to her where he said he could impose the death penalty. [¶] If she's telling us the way people dress, and then basically she's saying if someone is poor and can't afford a suit and tie . . . ."

38

The trial court: "No, no. That's not it at all. His general appearance and demeanor had nothing to do with money. He could be the wealthiest person in the room. [¶] And that is, his style of hair, and so on, as far as the mainstream is concerned, is bizarre. So we all know that. Whether it's a cause for challenge or not — but then for peremptories, there are hunch peremptories. And I think that . . . ."

The prosecutor: "May I also — and I can shore up the record a little bit. His feeling as to the worst problem in the criminal justice system is, 'Sometimes people are tried with lack of evidence; innocent people being convicted. Guilty, known fact, getting away easy.' [¶] And people with attitudes like that are not going to be open-minded."

Defense counsel: "Well, all I would say, your Honor, his clothing was neat. I take heed [*sic*] with the description. He was here every day. His hair was very neat. We're not talking about someone who was dirty and messy. His T-shirts were tucked in. [¶] I don't think there's anything about his general appearance that's been fairly characterized. He wore a T-shirt. It was tucked in and clean every day."

The prosecutor: "He looked bizarre."

Defense counsel: "In addition, his haircut is not an unusual haircut in the Black population."

The trial court: "Oh, I don't think you can justify that . . . ."

Defense counsel: "Your Honor, ponytails are in style, not just with White people."

The trial court: "No, no, no. I would take note of the fact that his appearance was bizarre enough that court personnel, long before there was any challenge posed, commented about it. People on the staff commented about his odd appearance. So it's something that I just take notice of."

39

Defense counsel: "In Norwalk, in this courthouse, it may be an odd appearance. In Central Los Angeles, if that man walked in on a jury panel, I would take heed [*sic*] that he would stand out. [¶] We're entitled to a cross-section of the community. And we're not getting it. We're not getting a cross-section of the community here because based upon her exercising five peremptories against Hispanic women, two of the peremptories against Black people, we're not getting a cross-section of the community here. [¶] This community is 49 percent Hispanic. And we're not getting a representative panel here. Look at that. That panel doesn't represent — the 11 in the box don't . . . ."

The trial court: "Would you suggest that in order to make things fair that we should abandon our random selection and start calling the only other Black people out of order just to get them on the panel?"

Defense counsel: "There's no such suggestion, Your Honor. What we're saying is mathematically they were excluded. They're no part of the venire."

The trial court: "Counsel have a right to exercise peremptory challenges without stating reasons. And *Wheeler* says that if there is a pattern of systematic exclusion — and one doesn't make a pattern. We took it up, the very first one that came up. And she justified it. [¶] Now you take it up with the second one that's come up. And the court believes she's justified her feeling about it. And I would venture to say that because of his appearance, his general appearance, that most attorneys in a civil or criminal lawsuit, one side or the other would exercise a peremptory of a person who had this unusual appearance. [¶] And based on answers to the questionnaire, I do not feel that there's any showing that she excused him because — that he happened to be Black. I think if he were White and had exactly the same demeanor and hair style and answers, that she would have the same basis for excusing him."

40

Here also, as with Prospective Jurors P.J. and Mary G., the issue of whether defendant made a prima facie showing is moot because the prosecutor explained her reasons for the peremptory challenge of Prospective Juror Myron G., and the trial court ruled on the ultimate question of intentional discrimination. (*Hernandez v. New York*, *supra*, 500 U.S. 352, 359; *People v. Booker*, *supra*, 51 Cal.4th 141, 165; *People v. Lewis*, *supra*, 43 Cal.4th 415, 471.) We therefore proceed to step three of the *Batson/Wheeler* analysis.

Arguing that the trial court erred in denying the defense objection to the prosecution's peremptory challenge of Prospective Juror Myron G., defendant asserts that the prosecutor's stated reasons were "specious at best" and that her characterizations of his appearance "are belied by the record." We disagree. As we have explained, "[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix*, *supra*, 44 Cal.4th 602, 613.)

The prosecutor stated, first, that Prospective Juror Myron G. "came into this courtroom each day dressed in T-shirts and jeans." The defense did not dispute that statement, nor did the defense assert that other prospective jurors had been similarly dressed. Defense counsel noted that Myron G.'s clothes were clean and neat, but the prosecutor had not stated otherwise.

The prosecutor noted, second, that Prospective Juror Myron G.'s hairstyle was unusual and that he "looked bizarre." Defense counsel conceded that "it may be an odd appearance" in the courthouse where the case was tried, although defense counsel asserted that it would not be unusual in Central Los Angeles. The trial court agreed that Myron G.'s hairstyle was "bizarre," noting that trial court personnel had commented on his unusual appearance.

The prosecutor stated, third, that during voir dire Prospective Juror Myron G. "wouldn't make eye contact with anybody" and "wasn't paying attention."

41

Defense counsel did not deny that Myron G. had failed to make eye contact, although counsel did deny that Myron G. had failed to pay attention. The trial court did not comment on this reason, but we may infer that it agreed with the prosecutor's characterization of Myron G.'s demeanor.

The prosecutor stated, fourth and finally, that certain questionnaire answers by Prospective Juror Myron G. indicated that he was "not going to be open-minded." In particular, the prosecutor noted that, when asked to describe the "most important problems in the current criminal justice system," Myron G. had written: "Sometimes people are tried with lack of evidence. Innocent people being convicted. Guilty (known fact) people getting away easy." When asked to list "any biases you might have," he had written: "If justice is not served correctly I tend to be biased against the judicial system."

The prosecutor's stated reasons are permissible and race neutral, and they provide a plausible explanation for the peremptory challenge. We have no reason to question the trial court's implied findings that Prospective Juror Myron G.'s clothing stood out in its informality, that his hairstyle was unusual, and that he failed to make eye contact during voir dire, while the record supports the prosecutor's description of his questionnaire answers. Therefore, substantial evidence supports the trial court's finding that the peremptory challenge of Prospective Juror Myron G. was not racially motivated.

Defendant argues on appeal that a comparative juror analysis shows the prosecutor's stated reasons were pretextual rather than genuine. But defendant identifies no other juror who came to court every day dressed in jeans and a T-shirt, who had a hairstyle so unusual that court personnel had commented on it, or who failed to make eye contact with anyone during voir dire. Defendant asserts, however, that four prospective jurors gave answers similar to those of Prospective Juror Myron G. when asked by the questionnaire to state what, in their opinion,

42

were the most important problems with the current criminal justice system. We disagree that their answers were similar to Myron G.'s.

Juror J.B., who sat on the jury, wrote: "Too many people waiting to be tried. Criminals set free." Juror B.M., who also sat of the jury, wrote: "Convicted criminals get out before their sentence is over." Prospective Juror F.P., who was removed by defense peremptory challenge, wrote: "Overcrowded courts; system allows too much leniency for technical violations resulting in reversals; unequal access to legal representation." Finally, Prospective Juror L.C., who was also removed by defense peremptory challenge, wrote: "Lack of jail space; sentencing rules."

Unlike the response of Prospective Juror Myron G., none of these responses reflects a belief that cases were being brought to trial with a lack of evidence or that innocent people were being convicted. The prosecutor could reasonably regard these responses more favorably than the response of Myron G. and might reasonably prefer jurors who did not hold the views that only Myron G. had expressed. (See *People v. Taylor*, *supra*, 47 Cal.4th 850, 896.) We therefore reject defendant's comparative juror analysis.

### 4. Prospective Juror A.O.

During the selection of alternates, the prosecutor used the second of her four peremptory challenges to remove Prospective Juror A.O., a Hispanic woman. Defense counsel renewed the *Batson/Wheeler* objection, saying: "Your Honor, again, we see a pattern of excusing female Hispanics from the jury panel, even as an alternate." The following exchange occurred:

The trial court: "Look at the questionnaire. [¶] She says, 'I don't believe in the death penalty.' "

43

Defense counsel: "Your Honor, we had a chance to clear that up in voir dire. Everybody that was up on the panel had a chance to explain their answers. She did and said she could and she would in the right case. [¶] It's submitted with the court. The court can make the call."

The trial court: "All right. [¶] But in view of the answer in the questionnaire, and changing of the position, I think counsel is justified; and I think based on that showing, I would have to find it's coincidental that she happens to be Hispanic in the case."

Because the trial court overruled the defense objection without asking the prosecutor to state her reasons for the peremptory challenge of Prospective Juror A.O., we construe the trial court's ruling as a finding that the defense failed to make a prima facie case. To establish a prima facie case, a defendant's " 'burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." ' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 486, quoting *Johnson v. California*, *supra*, 545 U.S. 162, 170.) As in other recent cases where we cannot be sure the trial court used the correct standard, "we review the record independently to resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Hartsch*, *supra*, at p. 487.)

To determine here whether defendant has established a prima facie case, we may consider whether the record discloses neutral, nondiscriminatory reasons for the challenges. (*People v. Garcia* (2011) 52 Cal.4th 706, 749; *People v. Bonilla* (2007) 41 Cal.4th 313, 346.) This approach seems particularly appropriate here because the prosecutor had previously indicated, when explaining her peremptory challenge of Prospective Juror P.J., that she intended to peremptorily challenge prospective jurors whose questionnaire responses indicated they were "weak on death." As the trial court correctly observed, when asked for her "opinion

44

regarding the death penalty," Prospective Juror A.O. had written on her questionnaire, "I don't believe in death penalty." She wrote the same answer when asked why she "might or might not want to sit on this particular case." On voir dire, she avoided a challenge for cause by stating that she could vote for the death penalty "depending on the situation, you know, depending on if it's a heinous crime or premeditated." Nevertheless, her questionnaire answer put A.O. squarely in the category of being "weak on death" and provides a valid and persuasive explanation of the prosecutor's peremptory challenge. We therefore agree with the trial court that the defense failed to establish a prima facie case that discrimination had occurred.

### F. Alleged Bias of Trial Judge

Defendant contends that the trial court's acts and omissions during the jury selection process exhibited racial bias requiring reversal of his conviction and death sentence. By failing to raise at trial a claim of judicial bias, defendant has forfeited it. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110; *People v. Samuels* (2005) 36 Cal.4th 96, 114.) In any event, the claim lacks merit.

The first incident of which defendant complains occurred during a discussion of the contents of the juror questionnaire. The defense had proposed a series of questions for the purpose of revealing racial prejudice. The court stated that was "a very difficult and sensitive issue" and that "both sides are entitled to inquire into and to try to probe for possible prejudices that people have . . . ." In the course of this discussion the court stated: "I just had occasion to see the Martin Luther King Museum in Memphis, Tennessee, a very moving and powerful experience; and I have very strong feelings about the progress of Afro-Americans in the country based on the exhibits there and what happened in the Deep South, *contrasted, I think with California to a certain extent*." (Italics added.) Defendant

45

asserts that the italicized words are evidence that the "trial court apparently believed that racism is confined to the South and the 1950's." We draw no such inference. Had the trial court held such a belief, it would have prohibited all questions regarding race and racial prejudice. Instead, it allowed the parties ample opportunity to question prospective jurors on that subject. The trial court's remark that the visit to the civil rights museum was a "very moving and powerful experience" suggests an absence of racial bias against African-Americans.

During the same discussion, the trial court also stated: "I think that on this subject you just got too much in there that you are putting emphasis where it isn't really called for. Because it isn't as though this were some — if the theory of this case were some kind of hate crime that was racially motivated, or there were particular racial overtones that caused this crime to be committed that would not have been committed before, for racial aspects, then I think you would be entitled to probe into that in great detail."

We find nothing objectionable in this comment. Recognizing that this case involved an interracial killing — because defendant is African-American and the armored car guard who was killed happened to be White — the trial court permitted extensive inquiry into the issue of racial prejudice. (See *People v. Bolden* (2002) 29 Cal.4th 515, 539 [in a case involving an interracial killing, a trial court must grant a defense request to question prospective jurors about racial bias].) Indeed, defendant makes no claim that voir dire on this issue was inadequate. That the trial court would have permitted an even more extensive inquiry had there been an allegation that the killing was racially motivated is not evidence of judicial bias.

Next, defendant complains about the trial court's remarks during a discussion about a defense challenge for cause to Prospective Juror T.K. The defense argued that T.K., who identified his race as White, was racially biased

46

because on the juror questionnaire he had answered "Yes" to this question: "Do you think Afro-Americans are more likely to commit crimes than other racial groups?" The trial court stated: "There have been statistical studies that would back that up. So let's leave the race part out of it, and let's just talk about how many people there are in a statistical group in the community, and what's the proportion of crime. And he can say that without being a racist at all."

We do not agree that the trial court's comment demonstrates racial bias. In stating that someone could believe, "without being a racist at all," that "a statistical group in the community" committed a disproportionate number of crimes, the trial court's point, we infer, is that interpreting statistical data about race and crime is controversial and subject to debate. For example, one commentator, while stating that there are "some crimes that [B]lacks do commit disproportionately," argues that "Blacks do not commit crimes because they are [B]lack." Rather, "[t]heir overrepresentation among some classes of offenders is attributable to social and environmental conditions such as poverty, miserable schools, broken families, lack of access to health care, and even lead poisoning." (Butler, *One Hundred Years of Race and Crime* (2010) 100 J. Crim. L. & Criminology 1043, 1058-1059, fns. omitted; see also Peterson & Krivo, *Race, Residence, and Violent Crime: A Structure of Inequality* (2009) 57 U. Kan. L.Rev. 903.)

Immediately after the trial court made that remark, defense counsel stated: "Your Honor, my client is a Black man. He's accused of killing a White man. We have no Black — we're going to lose one of the only two male Black jurors in the entire panel." Defense counsel was referring to Prospective Juror R.M., an African-American man whom the prosecutor had successfully challenged for cause. The trial court responded with these statements: "[R.M.] has nothing to do with [T.K.]. . . . [¶] . . . If all of the other people in this whole panel were Black —

47

we're talking about [T.K.] now.  And — so I can't be concerned with the racial make-up of this jury because you are losing a Black person for cause, therefore, I should lean over backwards and excuse White people just on that basis."

We do not agree with defendant that by this remark the trial court was "claiming a strange impotence to remedy the situation" or was improperly refusing to "take any responsibility for the likelihood that the venire was going to be completely lacking in African-American jurors."  What the remark showed, rather, was that the trial court was properly considering each challenge for cause separately, on its legal merits, without allowing its rulings to be improperly influenced by how they might affect the racial composition of the jury ultimately selected.

Next, defendant cites remarks by the trial court when ruling on the defense *Batson/Wheeler* objection to the prosecution's peremptory challenge of Prospective Juror Mary G.  (See, *ante*, at pp. 34-37.)  In denying a defense request to require the prosecutor to explain the reasons for earlier peremptory challenges to Hispanic women, the court said:  "Because I sounded a note of caution before and said that I had noticed a pattern, that there were systematic Hispanic names, although a couple of them I noticed appeared to be Hispanic by marriage rather than Hispanic because they were not Hispanic coloring. . . ."  Defense counsel objected "to the court's classification of these women as being possibly Hispanic by marriage," adding that "Hispanic names come in all colors just as any other names."  The court responded:  "Well, all right.  That was simply my observation.  And I stand corrected on that because without going into what maiden names were, why, obviously that isn't a warranted conclusion."

Defendant complains that the quoted remarks show that the trial court "denied a pattern of removing five Hispanic people for the fatuous reason that they were 'Hispanic by marriage' rather than 'Hispanic coloring' — a justification that

48

has no basis in law or fact." We disagree. Insofar as the trial court suggested it could identify a Hispanic person solely by appearance or "coloring," the court immediately acknowledged its mistake. Insofar as the trial court remarked that a Hispanic surname did not prove Hispanic ancestry because many women assume their husband's surname at the time of marriage, the court's point was valid. Here, the most reliable guide was the prospective jurors' own descriptions of their race and ethnicity on the juror questionnaires. Examination of those questionnaires show examples of women with Hispanic surnames who identified themselves as "White" or "Caucasian" without indicating any Hispanic or Latino ancestry. Viewed in context, the court's remarks do not establish any disqualifying racial or ethnic bias.

## III. ISSUES RELATING TO GUILT

### A. Denial of Mistrial Motion

Defendant contends the trial erred in denying his motion for a mistrial, and that the ruling deprived him of his federal constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to due process, a fair trial based on the evidence, confrontation of witnesses against him, and a fair and reliable sentencing determination.[6]

---

[6]     Regarding this claim and other claims raised on this appeal, defendant asserts that the alleged error or misconduct violated several of his federal constitutional rights. He did not, however, expressly assert each of these constitutional claims in the trial court. "Unless otherwise indicated, his appellate claims either required no action by him to preserve them, or they involve[] application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial court error or misconduct had the additional legal consequence of violating the federal Constitution. 'To that extent, defendant has not forfeited his new constitutional claims on appeal.' [Citation.] On the merits, no separate constitutional discussion is required, or provided, when rejection of a claim that the trial court erred on the issue presented

*(Footnote continued on next page.)*

49

On the second day of the guilt phase trial, out of the jury's presence, defense counsel moved for a mistrial. Counsel said he had noticed, during the recess, "that there has been a box sitting on top of counsel table that has got the label which basically states, witnesses: Lucky's, L.A.S.O.; Boys, Inglewood; Hughes, L.A.P.D.; San Bernardino, Los Angeles, Bellflower, and Long Beach." Counsel said the box had been on the table "in a position where jurors can see it when they are coming in and out, and possibly have a view of it from the jury box." The prosecutor argued that the jurors "could never understand from reading the front of the box" what these words meant.

The trial court remarked that it was "very thoughtless" and "very foolish" to place a box with this sort of label where jurors could see it, and it directed the prosecutor to remove the box from the courtroom before the jurors returned. The trial court offered to give a cautionary instruction regarding the incident, but it denied the motion for a mistrial, saying that it did not think the risk of prejudice "rises to the level of having to mistry the case." The defense did not accept the trial court's offer of a curative instruction.

To require the grant of a mistrial motion, the risk of prejudice must be incurable by admonition or instruction. (*People v. Alexander* (2010) 49 Cal.4th 846, 915.) Because the trial court is generally better able than an appellate court to make this determination, a ruling denying a motion for mistrial is reviewed under the deferential abuse of discretion standard. (*People v. Lucero* (2000) 23 Cal.4th 692, 714; *People v. Price*, *supra*, 1 Cal.4th 324, 428.)

---

*(Footnote continued from previous page.)*

to that court necessarily leads to rejection of any constitutional theory or
' "gloss" ' raised for the first time here. [Citation.]" (*People v. Bacon* (2010) 50
Cal.4th 1082, 1101, fn. 3.)

We find no abuse of discretion here. The record amply supports the trial court's conclusion that defendant's chances of receiving a fair trial had not been irreparably compromised. The label of the box suggested, at most, that defendant was suspected of having committed one other supermarket robbery (the Hughes Market robbery) in addition to the two for which he was being tried (the Lucky Supermarket and Boys Market robberies). An admonition to disregard any such inference would have been adequate to cure any prejudice to the defense.

Defendant also asserts that the prosecutor committed prejudicial misconduct by placing the box where jurors could see it. Because the defense did not request an admonition, the prosecutorial misconduct claim is not cognizable. (*People v. Doolin*, *supra*, 45 Cal.4th 390, 444.) In any event, the claim fails on the merits because, as already explained, the risk of prejudice or unfairness to defendant was not substantial.

### B. Evidence Implying Threat to Prosecution Witness

During cross-examination of prosecution witness Janet Delaguila, the Lucky Supermarket employee who recognized defendant as a regular customer of the dry cleaning store where she previously had worked, defense counsel asked whether she was "receiving any benefits from Lucky's or anybody else with regard[] to this incident." She answered, "No." Under further questioning, she said that Lucky was leasing a car for her, but that she was paying for it.

On redirect examination, the prosecutor asked Delaguila why Lucky had leased a car for her. She replied that she needed a car for transportation because her "place of employment had to be relocated after this incident" for her "personal safety." After the witness gave this testimony, the defense objected on relevance grounds, but the trial court overruled the objection, saying that the defense had "brought it up" and that the prosecutor was "entitled to clear up the matter." On

51

further questioning by the prosecutor, Delaguila testified that she was "moved from the Lucky store after [she] identified the defendant as the person who was running from the store," that she was moved to "another place of work within the Lucky's Corporation," that this was "a substantial distance from the Lucky's in Bellflower," and that this was done for her safety.

Defendant contends the trial court erred in overruling the defense objection, and that the prosecutor committed misconduct by asking these questions, because the questions and the statements implied, without supporting evidence, that "defendant had threatened the personal safety of a witness."

We conclude there was no error and no prosecutorial misconduct. As the trial court recognized, once defense counsel, by his questions to Delaguila, had implied that a car had been leased for her to reward her for her cooperation in the prosecution of defendant, the prosecution was entitled to dispel that inference by showing the true reason for the leasing of the car, which was that her place of employment had been relocated because of her concern for her personal safety. Defendant's argument is based on the faulty premise that by revealing this reason Delaguila's testimony necessarily or strongly implied that Delaguila had received threats. We perceive no such implication. A key prosecution witness in a death penalty case involving a robbery murder might well fear for her personal safety in the absence of any express or implied threat. Moreover, if the defense was concerned that the jury might draw such an inference, remedies were readily available. Defense counsel could have cleared up the matter by asking Delaguila whether she had been threatened or by asking the prosecution to stipulate that she had not been threatened. The defense made no such request.

52

### C. Photograph of Defendant

During the guilt phase, defense counsel objected to a photograph of defendant, taken in 1987, that the prosecutor intended to introduce in evidence. Defense counsel said there was "no foundation" for the photograph because defendant's "appearance in 1987 is not really in issue" and also because in the photograph defendant's hair was in rollers and "no one has identified it as ever having been like that." The prosecutor responded that the photograph was being offered to corroborate Janet Delaguila's identification of defendant as the perpetrator of the Lucky Supermarket robbery. Finding that "the prejudicial effect is absolutely minimal," the trial court overruled the objection. Defendant now challenges this ruling.

Trial court rulings on the admissibility of evidence are reviewed for abuse of discretion. (*People v. Booker*, *supra*, 51 Cal.4th 141, 170.) Here, the trial court did not abuse its discretion in overruling the defense objection to the photograph of defendant. The photograph was relevant to corroborate the testimony of prosecution witness Janet Delaguila about the length and style of defendant's hair. She testified that in 1987, when she knew defendant as a regular customer of the dry cleaning store where she worked, defendant "had longer hair, kind of in a jheri curl" and that his hair at that time was "down to his shoulder." She also testified that she had seen him at Lucky Supermarket two days before the robbery and murder there, and at that time defendant's hair was "shoulder length" and "curled — curled with activator, what have you." On the day of the robbery and murder, his hair was "close to the head" on top, but "long in the back."

The trial court reasonably determined, under Evidence Code section 352, that the challenged photograph's probative value was not substantially outweighed by the risk of prejudice. "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with

very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842; see also *People v. Doolin*, *supra*, 45 Cal.4th 390, 439.) In this prosecution for the December 1988 murder of armored car employee Rooney at the Lucky Supermarket, evidence that defendant at one time had used rollers to curl his hair was unlikely to produce in the jurors a strong emotional bias against him.

### D. Limits on Cross-examination of Expert Witness

Los Angeles County Deputy Sheriff Ronald George testified for the prosecution as an expert crime scene investigator and latent fingerprint examiner. After the robbery and homicide at the Lucky Supermarket on December 15, 1988, he examined objects found in the stolen van that had been used as the getaway vehicle. He photographed two fingerprints found on a plastic container lid and three fingerprints found on a tabloid newspaper. After comparing them to fingerprints taken from defendant, he determined they were all made by the same person.

On direct examination, in response to a question from the court asking "how many points of comparison" he had counted, Deputy George said: "I don't count points when I'm making a comparison. However, none of the fingerprints that I compared had less than 10." On cross-examination, defense counsel asked whether, in "the scientific community of fingerprinting," there was "an accepted number of minimum characteristics that must be shown in a fingerprint before an expert will render an opinion that that print belongs to a definite person." George answered, "No." Asked whether he agreed "that within the articles that are published in the scientific community dealing with this topic, that the general consensus is that you need a minimum of 10 characteristics before an opinion can be rendered as to the identity of the fingerprint donor," George again answered,

"No," explaining that experts from the Federal Bureau of Investigation had told him they had "testified to less than 10." Later, defense counsel asked if George would agree that one of the fingerprints he had matched to defendant "had a maximum of eight characteristics." George replied that one of the fingerprints "did not have a whole lot of characteristics," but that "it had enough characteristics for me to form an opinion" that defendant had made it. Defense counsel asked whether any of the prints matched to defendant had fewer than 10 characteristics. George replied that he "would have to count them."

At this point, the trial court directed counsel to approach the bench. The court told defense counsel it was "about to cut this off under [Evidence Code section] 352 as an unconscionable waste of the court's time" unless counsel was prepared to make an offer of proof that a defense expert would testify that the print was not defendant's. Defense counsel replied that a defense expert would testify there was "a minimum number of characteristics" that was "accepted within the relevant scientific community," that one of the prints had only eight characteristics in common with defendant's prints, and that this was insufficient to say definitely that there was a match. When the trial court asked about the other four fingerprints that Deputy George had matched to defendant, defense counsel replied only that these other prints had not been found on the van itself but only on "things that are in the vehicle." When the prosecutor asked for discovery of reports prepared by defense fingerprints experts, defense counsel replied that the defense was not required to turn over the reports until they decided to call an expert, and that at that point counsel had "no intention of calling an expert." Cross-examination continued on other topics. Later, during redirect, Deputy George testified that two defense experts had examined the fingerprint evidence on which he had based his testimony.

55

Defendant contends that the trial court erroneously cut off his cross-examination of Deputy George, the prosecution's expert witness, thereby violating his right of confrontation under the Sixth Amendment to the federal Constitution. We disagree.

" '[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation,' " and " 'the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 372; accord, *People v. Hamilton* (2009) 45 Cal.4th 863, 943.) Here, after defense counsel had cross-examined Deputy George extensively on the subject of fingerprint identification in general, and on the particular fingerprints that he had matched to defendant, the court appropriately questioned the need for further cross-examination on those topics, mentioning Evidence Code section 352. The defense questioning had been directed to just one of the five fingerprints that Deputy George had matched to defendant. Defense counsel told the trial court that, according to a defense expert, that particular print was possibly, but not certainly, defendant's. Asked about the other four fingerprints, defense counsel said only that those prints had not been found on the van itself, but only on objects within the van. From this response, the trial court could infer that the defense did not dispute the match of the other four fingerprints, *including one found on the very same object (the plastic container lid) as the questioned print*. Assuming for the sake of argument that the trial court's remarks effectively cut off this particular line of cross-examination, we find no abuse of discretion because the cross-examination's relevance was marginal at best. Under Evidence Code section 352, the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time . . . ."

### E. Limits on Third Party Culpability Evidence

During presentation of the prosecution's case at the guilt phase, out of the jury's presence, the prosecutor moved to exclude evidence of "10 unsolved armored car robberies, one of them involving a murder." The prosecutor said that the defense was planning to introduce evidence of these other robberies to support a third party culpability defense. The defense would argue that Steven Young, whose fingerprints had been found in the van in which Patrick Rooney's killer had escaped from the scene of the Lucky Supermarket crimes, had committed the other armored car robberies and therefore had also committed the charged offenses.

The trial court questioned whether such evidence would be admissible absent evidence that Steven Young's guilt had already been adjudicated in another forum and absent evidence that the charged and uncharged offenses were highly similar. Defense counsel indicated that they were still searching for and reviewing documents related to the other robberies. The court scheduled a hearing on the matter for the next day.

The defense then filed a "memorandum in support of admission of third party evidence," with attached exhibits relating to four robberies of armored truck guards that had occurred between December 22, 1987, and November 26, 1988. The exhibits indicated that Steven Young had pled guilty to one of these robberies and had been identified by witnesses as a perpetrator of another. After a hearing, the trial court ruled that evidence of other crimes committed by Young would not be admitted. Defendant contends the trial court erred in so ruling. We disagree.

"[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt[] must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to

57

defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325; accord, *People v. Lynch* (2010) 50 Cal.4th 693, 756; *People v. McWhorter* (2009) 47 Cal.4th 318, 367-368.) Evidence of a third party's prior crimes is inadmissible to establish the third party's criminal propensity. (Evid. Code, § 1101, subd. (a); *People v. Vines* (2011) 51 Cal.4th 830, 864; *People v. Davis* (1995) 10 Cal.4th 463, 500-501.) For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, " '[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403; accord, *People v. Vines*, *supra*, at p. 856.) A large number of common marks may, when viewed in combination, establish the required distinctive pattern. (*People v. Miller* (1990) 50 Cal.3d 954, 988-989.) A trial court's ruling excluding third party culpability evidence is reviewed for abuse of discretion. (*People v. Brady* (2010) 50 Cal.4th 547, 558.)

No abuse of discretion occurred here. In each of the four robberies that defendant sought to introduce, the victim was confronted with two armed perpetrators working as a team; in each of the charged robberies, however, the victim was attacked by a lone gunman. Although the charged and uncharged offenses are similar in some respects — each involved the robbery of an armored truck guard at a business immediately after a cash pickup — those common features, whether considered separately or together, are not so unusual and distinctive as to be like a signature. Finally, the trial court could reasonably conclude under Evidence Code section 352 that the probative value of the evidence, if any, was substantially outweighed by the undue consumption of time required for its presentation and the substantial danger of confusing the issues.

58

The trial court's ruling did not preclude the defense from presenting to the jury its third party culpability defense. The prosecution's fingerprint expert testified that Stephen Young's fingerprint was found on a newspaper in the Lucky Supermarket getaway van, and the trial court allowed the defense to present evidence that three eyewitnesses had selected Young's photograph from a "six-pack" photo array as being a photograph of Patrick Rooney's killer.

## F. Defendant's Courtroom Behavior

During presentation of the defense case at the guilt phase, defendant stood up and threw one apple at the trial judge and two apples at jurors. The trial judge was not struck, but two jurors were struck by the apples. Proceedings were immediately halted, and the jury left the courtroom. When proceedings resumed, out of the jury's presence, the trial court explained for the record what had occurred. The trial court said that before the incident defendant had acted appropriately in the courtroom at all times. As a result of the incident, one of the jurors was "extremely upset" and appeared to be "hyperventilating" and "close to hysteria."

To reassure the jurors that they need have no fear for their safety, the trial court ordered that defendant be restrained in the courtroom in a manner that would not allow him to throw anything. The court warned defendant that any further outburst on his part would result in exclusion from the courtroom. The court said it would not declare a mistrial but would bring the jurors into the courtroom to inquire whether they would be able to continue with the morning session or would prefer instead to recess until that afternoon. The court said it would not make an individual inquiry of the jurors regarding how the incident had affected them, but it would instruct them to decide the case on the evidence and not on defendant's courtroom conduct.

59

At this point defendant said, "This is shit." He was escorted from the courtroom. The trial court told defense counsel that defendant was very close to being excluded from the courtroom for the rest of the trial. In defendant's absence, the jury was brought back into the courtroom. The court told the jurors that defendant would be restrained with a waist chain and handcuffs for the remainder of the trial, so that he would be unable to throw anything or to approach the jurors. The court instructed the jury to decide the case based on the evidence — the exhibits and the sworn testimony — and not on the basis of defendant's conduct in the courtroom. The court said it had brought the jurors into the courtroom "to inquire of each and every one of you if you are able to continue with the trial this morning, or if you would prefer to recess to compose yourself a little bit, and settle down and have the trial this afternoon." The court inquired: "How many of you feel that you would prefer to recess this morning's proceeding and resume this afternoon rather than to start the trial right now as we planned? Everybody feels that we're okay now to proceed with the trial? All right."

The trial court granted defense counsel's request for a 10-minute recess to talk to defendant before proceedings resumed. The trial then proceeded without any other incidents of disruptive courtroom behavior by defendant.

Based on this incident, defendant contends the trial court erred in not suspending proceedings to determine whether he was competent to stand trial, in not declaring a mistrial, and in not questioning the jurors individually to determine whether any of them were no longer able to fairly and impartially determine defendant's guilt and punishment. As we explain, these contentions lack merit.

"The due process clause of the federal Constitution's Fourteenth Amendment prohibits trying a criminal defendant who is mentally incompetent. [Citations.] A defendant is deemed competent to stand trial only if he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of

60

rational understanding" ' and ' "has a rational as well as factual understanding of the proceedings against him." ' [Citation.]"  (*People v. Ary* (2011) 51 Cal.4th 510, 517.)

If presented with "evidence that raises a reasonable doubt about a defendant's mental competence to stand trial," a trial court must suspend the criminal proceeding and hold a hearing to determine the defendant's mental competence.  (*People v. Ary*, *supra*, 51 Cal.4th 510, 517.)  "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial."  (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)  Here, defendant's disruptive courtroom behavior — throwing apples and saying "This is shit" — was evidence that he was angry and upset, and perhaps that he was wished to interrupt the proceedings, but it was not evidence sufficient to require the trial court to conduct a mental competency hearing.  (See *People v. Medina* (1995) 11 Cal.4th 694, 735 ["[d]efendant's cursing and disruptive actions displayed an unwillingness to assist in his defense, but did not necessarily bear on his *competence* to do so . . ."].)  Defense counsel at no time expressed any doubts about defendant's understanding of the proceedings or his ability to assist in his defense.  (See *People v. Rogers*, *supra*, at p. 848.)  Accordingly, the trial court did not err in failing to suspend criminal proceedings for the purpose of inquiring into defendant's mental competence.

Nor did the trial court err by not questioning the jurors individually to determine whether defendant's misconduct had prejudiced them against him.  Because a defendant is not allowed to profit from his own misconduct, a defendant "may not complain on appeal about the possible effect on jurors of his own misbehavior after the jury has been sworn."  (*People v. Huggins* (2006) 38 Cal.4th 175, 201.)  The trial court did ask the jurors whether they felt able to continue, and

61

the record does not indicate that any juror expressed an inability to do so.  Under the circumstances, this was sufficient.

A mistrial motion must be granted only when the risk of prejudice is incurable by admonition or instruction.  (*People v. Alexander*, *supra*, 49 Cal.4th 846, 915.)  We review a trial's ruling denying a motion for mistrial under the deferential abuse of discretion standard.  (*People v. Lucero*, *supra*, 23 Cal.4th 692, 714.)  No abuse of discretion occurred here.  Even if we assume a defendant's courtroom misbehavior could ever require a mistrial, here the trial court could reasonably conclude that a general inquiry about the jury's ability to continue, combined with an instruction that the case was to be decided solely on the evidence, was sufficient to cure any prejudice and that a mistrial was not required.

### G.  Instruction on Flight

At the guilt phase, the trial court gave the jury this standard instruction on flight:  "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt; but it is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of guilt or innocence.  The weight to which such circumstance is entitled is a matter for the jury to determine."  Section 1127c requires the trial court to give this instruction whenever the prosecution relies on evidence of flight to establish guilt.

Defendant contends, first, that the trial court erred in not deleting the language referring to flight after being accused of a crime, because there was no evidence that defendant fled after being accused of the charged crimes.  By its terms, the instruction applied only if the jurors found that the described flight had been shown.  In the absence of any evidence of flight after accusation, the jury

62

would have understood that the instruction was to that extent inapplicable.  The superfluous reference to flight after accusation caused defendant no prejudice.

Next, defendant asserts that the trial court erred in not modifying the instruction to include a requirement that the jury first consider whether defendant was the perpetrator before considering whether to infer consciousness of guilt from his flight from the scene of the crime.  The proposed modification was unnecessary.  By its terms, the instruction applied only to flight by a defendant.

Finally, defendant argues that the instruction should not have been given because the sole question for the jury was whether defendant was the perpetrator of the charged offenses and there was no evidence of flight by defendant apart from his identification as the perpetrator.  We have held to the contrary.  (*People v. Avila*, *supra*, 46 Cal.4th 680, 710; *People v. Abilez* (2007) 41 Cal.4th 472, 521-522; *People v. Jones* (1991) 53 Cal.3d 1115, 1144-1145.)  Here, many witnesses who identified defendant as the person they saw running through the Lucky Supermarket had not seen the shooting of armored car guard Patrick Rooney or the taking of Rooney's canvas bag containing the store's receipts.  As to these witnesses in particular, the jury instruction correctly explained that the evidence of defendant's flight supported an inference that he was the perpetrator of the robbery and murder of Rooney.

## H.  Instruction on Reasonable Doubt and Burden of Proof

The trial court instructed the jury with CALJIC No. 2.90, as follows: "Reasonable doubt . . . is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the jury."  Defendant contends that this instruction inadequately or improperly defines reasonable doubt and the prosecution's burden of proof.  We in

63

previous cases have consistently rejected this contention. (*People v. Taylor* (2010) 48 Cal.4th 574, 631 [and cases cited therein].) We do so again here.

## I. Sufficiency of Evidence to Establish Guilt

Defendant contends the evidence is insufficient to establish his guilt of the charged offenses. He argues that the eyewitness testimony identifying him as the perpetrator of the charged offenses is unreliable because the witnesses' initial descriptions of the perpetrator were inconsistent and because the identification testimony was tainted by suggestive lineups and photo arrays, and by the passage of time.

When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Lee*, *supra*, 51 Cal.4th 620, 632.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Here, multiple witnesses identified defendant in court as the perpetrator of the crimes at the Boys Market and the Lucky Supermarket. Their identifications of defendant were neither physically impossible nor inherently incredible. Inconsistencies in their initial descriptions of the perpetrator and any suggestiveness in the lineups or photo arrays they were shown are matters

affecting the witnesses' credibility, which is for the jury to resolve. We conclude that substantial evidence supports defendant's convictions.

Insofar as defendant is asserting that unduly suggestive pretrial identification procedures tainted the courtroom identifications, so that the witnesses should not have been permitted to identify defendant in court, defendant has forfeited the claim by failing to make a timely objection or motion to exclude in the trial court. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1250; *People v. Medina*, *supra*, 11 Cal.4th 694, 753.)

Defendant also asserts that he could not have committed the charged crimes because the perpetrator of those crimes was right-handed and he is left-handed. We reject this argument. During the trial's guilt phase, defendant presented no evidence that he is left-handed or that a left-handed person could not have committed the charged crimes.

## IV.  ISSUES RELATING TO PENALTY

### A.  Evidence of Uncharged Robbery and Shooting

Defendant contends that evidence of the robbery and shooting of Augustus Guardino at the Hughes Market in December 1987 should not have been admitted in aggravation at the penalty phase because the evidence identifying him as the perpetrator was insufficient. Because at trial defendant did not object to the evidence on this ground, the claim is forfeited. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1052.)

In any event, the claim lacks merit. During the trial, Augustus Guardino identified defendant as the person who robbed and shot him. His testimony, which was not physically impossible or inherently improbable, provided substantial evidence of defendant's identity as the perpetrator. (See *People v. Young*, *supra*, 34 Cal.4th 1149, 1181.) At trial, defendant argued that Guardino's identification

65

of him was unreliable because, among other things, Guardino saw the gunman for only a few seconds, he initially described the gunman as having a mole on his upper lip, and his identification was influenced by a composite drawing he saw in a newspaper. Such issues affecting witness credibility were for the jury to resolve. They do not alter our conclusion that substantial evidence supports defendant's identity as the perpetrator of the Hughes Market crimes.

### B. Evidence of June 1988 Firearm Possession

Defendant contends that the evidence that he possessed a firearm in June 1988 (see, *ante*, at p. 9) should not have been admitted in aggravation at the penalty phase under section 190.3's factor (b) because it was not criminal activity involving actual or threatened force or violence. We conclude the evidence was properly admitted.

"A trial court's decision to admit, at the penalty phase, evidence of a defendant's prior criminal activity is reviewed under the abuse of discretion standard. [Citation.] Possession of a firearm is not, in every circumstance, an act committed with actual or implied force or violence. [Citation.] The factual circumstances surrounding the possession, however, may indicate an implied threat of violence." (*People v. Bacon*, *supra*, 50 Cal.4th 1082, 1127.)

Here, defendant's firearm possession was criminal because former section 12031 made it a crime to carry a loaded firearm in a public place.[7] The firearm possession involved a threat of violence because, after Deputy Kuhn told defendant to put his hands on the hood of the patrol car, defendant reached for the pocket containing the gun while saying that he was going to show identification.

---

[7] Effective January 1, 2012, section 12031 was repealed and section 25850, which similarly prohibits carrying a loaded firearm in public, became operative. (Stats. 2010, ch. 711, §§ 4, 6.)

The jury could reasonably infer, under these circumstances, that defendant's intent, when he reached for the pocket containing the gun rather than the pocket containing his identification, was to draw the weapon for use in threatening or perhaps even shooting Deputy Kuhn.

### C. Prosecutor's Comment on Defendant's Lack of Remorse

During penalty phase argument to the jury, the prosecutor made these statements: "But the bottom line is a lot of victims came up and testified. And these were people, some of them, there was no question but that the defendant had shot them, had done things to them. And he sat there the whole time as he sits there now, and he doesn't care. He isn't remorseful in the slightest." Defense counsel objected without stating the basis of the objection. The trial court responded: "I think that's very much on the border. I would avoid that if I were you."

Defendant contends the prosecutor's quoted remark was an improper comment on defendant's failure to testify. We reject the claim because the prosecutor's statements were not improper. "Although the prosecution may not refer to the defendant's failure to testify, it may comment upon the defendant's lack of remorse." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1346.) The jury here would have understood the prosecutor to be referring to defendant's courtroom demeanor, which is a proper subject for comment during penalty phase argument (*People v. Valencia* (2008) 43 Cal.4th 268, 307-308; *People v. Haskett* (1990) 52 Cal.3d 210, 247) or to "the absence of evidence of remorse, which might have been presented by friends or relatives who believed he was remorseful" (*People v. Castaneda*, at p. 1346; see also *People v. Brady*, *supra*, 50 Cal.4th 547, 585 ["If defendant had appeared sorry in front of another person, performed an act of contrition, apologized to any of his victims, or otherwise

demonstrated any remorse, a witness other than he could have testified about such acts or statements, but none did."]).  The prosecutor here did not improperly comment on defendant's failure to testify.

### D.  Defendant's Courtroom Behavior

We have already considered defendant's claim of being prejudiced at the guilt phase by the trial court's response to the incident when he threw apples at the trial court and the jurors.  (See, *ante*, at pp. 58-61.)  Here, we consider defendant's related claims concerning the penalty phase.

After the jury reported that it had reached guilt phase verdicts, defendant expressly waived his right to dress in civilian clothing, and during all later proceedings in the jury's presence he wore jail clothing.  Also during the penalty phase, against the advice of counsel, defendant began wearing eyeglasses that were similar to those described by witnesses as having been worn by the person who robbed and killed Patrick Rooney.  Defendant argues that these actions provided further evidence that he was mentally incompetent to stand trial, and therefore the trial court erred in not suspending criminal proceedings to hold a competency hearing.  We disagree.

As we have stated in the past, the test for mental competency to stand trial is whether the defendant understands the proceedings rationally and factually and is able to consult with counsel with a reasonable degree of rational understanding. (*People v. Ary*, *supra*, 51 Cal.4th 510, 517.)  Here, defendant's decisions to wear jail clothing and eyeglasses after the jury had returned the guilt phase verdicts do not call his mental competence into question.  At most, they reveal his correct understanding that his guilt was no longer at issue during the penalty phase.

Defendant also argues that the prosecutor committed misconduct by arguing to the jury that defendant's courtroom misbehavior during the apple-

throwing incident could be considered in determining penalty. The argument was entirely proper. A defendant's courtroom demeanor and behavior are proper subjects for comment during penalty phase argument to the jury. (*People v. Valencia*, *supra*, 43 Cal.4th 268, 307-308; *People v. Haskett*, *supra*, 52 Cal.3d 210, 247.) Moreover, even were we to assume for the sake of argument that a juror might have construed the prosecutor's remarks as a comment on defendant's failure to testify, defendant's claim would still fail because those remarks were the sort of indirect, brief, and mild comment that we have consistently found harmless. (See *People v. Boyette* (2002) 29 Cal.4th 381, 455-456.)

### E. Instructions and Argument on Victim Impact

Defendant contends the prosecutor improperly referred to facts outside the record during penalty phase argument to the jury regarding the impact of armored car guard Patrick Rooney's murder on his family, and that the resulting harm was exacerbated by an incorrect jury instruction. We disagree.

Defendant's penalty phase occurred in March 1992, not long after the United States Supreme Court's decision in *Payne v. Tennessee* (1991) 501 U.S. 808, and this court's decision in *People v. Edwards* (1991) 54 Cal.3d 787, both concluding that victim impact testimony may appropriately be considered when determining penalty in a capital case. At the outset of the penalty phase, defense counsel stated that the defense had just received notice of the prosecution's intent to present victim impact evidence. Defense counsel said that if the court was going to allow this, the defense would request a continuance to investigate the evidence. The prosecutor said the only victim impact witness would be the wife of murder victim Patrick Rooney.

The next day, the trial court and counsel discussed the matter again. The court said that it seemed the prosecution was "entitled to argue victim impact as a

factor regardless of whether they call any witness or not," and it questioned what the prosecution would "gain by putting this poor woman on and having her break into tears and put her through the emotional travail of trying to describe the depth of her loss, when you can certainly comment on it as much as you please in your argument without having any supporting testimony." The court also questioned whether victim impact evidence should be limited to facts that were foreseeable by the defendant at the time of the capital murder. The court then ruled "that the defense objection is well taken as to calling the witness." The parties stipulated that a woman who was present in the courtroom was the wife of murder victim Patrick Rooney.

The prosecutor's argument to the jury concerning victim impact was limited to these statements: "We have Patrick Rooney who is now dead. He leaves his wife. She'll never be able to talk to him again. She and his family will never be able to talk to him, to share their plans, to do anything because the defendant didn't care. [¶] And he didn't have to. He didn't have to do it. He didn't have to kill — even if he wanted the money, he didn't have to. But he didn't care. He didn't care about what this was going to do to these other people, to Mrs. Rooney and to the family. He didn't care because he doesn't care about anything but himself and what's easy for him. [¶] So that, I guess, is what we have been talking about, the circumstances of the crime, the circumstances in aggravation."

Although insisting that the prosecutor's argument referred to facts outside the record, defendant does not identify a single such fact. From the parties' stipulation, the jury learned that Patrick Rooney was married and had a surviving wife. No evidence was needed to establish that Rooney's death would prevent his wife from ever again talking to him. Although no evidence was presented that Rooney was survived by family members other than his wife, it was reasonable to

70

infer the existence of additional family, and in any event reference to surviving family was harmless under any standard.

In substance, defendant argues that without actual testimony describing specific effects of the capital crime on surviving family members, any argument to the jury regarding victim impact is improper. This court has rejected that position, stating instead that a prosecutor's victim impact argument to the jury "need not be based upon specific testimony of the victim's family members describing their emotions; the prosecutor can urge the jury to draw reasonable inferences concerning the probable impact of the crime on . . . the victim's family." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017; accord, *People v. Sanders* (1995) 11 Cal.4th 475, 550.)

Regarding victim impact, the trial court gave the jury this instruction: "A factor you may consider in this phase of the trial is the specific harm caused by the defendant, including the impact on the family of Patrick Rooney. [¶] You may assess the harm caused by the defendant as a result of the murder of Patrick Rooney as a factor to be considered in determining the appropriate punishment." Defendant argues that the instruction was improper for two reasons. Because no victim impact testimony was admitted, defendant argues that no victim impact instruction should have been given. In the alternative, he argues that the instruction was incorrect because it encouraged the jurors to speculate about victim impact rather than limiting their consideration to facts supported by testimony or other evidence. We find no error in the instruction. As we have explained in the past, the jury may draw reasonable inferences about the likely impact of a capital murder on the victim's family. (*People v. Sanders*, *supra*, 11 Cal.4th 475, 550; *People v. Kirkpatrick*, *supra*, 7 Cal.4th 988, 1017.)

71

### F. Failure to Instruct on Costs of Imprisonment

The defense requested this penalty phase instruction: "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence you may not consider for any reason whatsoever the deterrent or nondeterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a life prisoner." Defendant contends the trial court erred in refusing to give this instruction. We disagree. Although the instruction was legally correct, the trial court was not required to give it if neither party raised the issue of cost or deterrence at trial. (*People v. Zamudio* (2008) 43 Cal.4th 327, 371; *People v. Benson* (1990) 52 Cal.3d 754, 807.) Here, the trial court cautioned the prospective jurors during voir dire that cost was not a factor to consider in determining penalty (see, *ante*, at pp. 19-21), no evidence on the subject was introduced during the penalty phase, neither side mentioned cost during argument to the jury, and cost was not among the factors the jury was instructed to consider in making the penalty determination. The prosecutor's questions to a defense penalty witness about life prisoners' access to television, libraries, recreational facilities, and conjugal visits did not raise the cost issue. (See *People v. Zamudio*, *supra*, at p. 371.) Because the issue of cost was not raised at trial, the proposed jury instruction was unnecessary, and the trial court did not err in refusing it.

### G. Self-representation

Defendant contends the trial court erred by granting his motion for self-representation without first advising him of the perils of self-representation and determining his competence to represent himself. The claim lacks merit.

Defendant was originally charged in May 1990 with armored car guard Patrick Rooney's murder, and counsel was appointed to represent him. In March 1991, the trial court granted defendant's motion for self-representation. Ten days later, at defendant's request, counsel was again appointed. Eventually, the trial

72

court granted the prosecution's motion to dismiss the charges, which the prosecution then refiled in a different district of the Los Angeles Superior Court.

After the refiling of the charges, defendant was continuously represented by counsel until the jury returned its penalty verdict. At that point, on April 22, 1992, defendant again moved for self-representation, giving this explanation: "The reason why I want to do [this] is because my counsel have no more trust — I have no trust in them. They gave me nothing but false promises and led me down a path full of lies. They have shown me ineffective assistance of counsel." After saying that defendant's attorneys "conducted themselves throughout this case in a very professional, thorough manner and did everything that could possibly be done under the circumstances in the face of overwhelming odds," the court acknowledged that defendant had the right to proceed with the sentencing without counsel. The court advised defendant that "it's an unwise decision for anyone to go pro. per." Asked by the trial court whether defendant understood the issues sufficiently to represent himself, Defense Counsel Ramirez said: "Well, in my discussions with him, he has always been rational and seems to understand everything that's going on. I have no reason to doubt that." The trial court ruled: "So I am going to make a finding, based on my observation and the representations of counsel, and taking judicial notice of the fact that another judicial officer on a previous occasion made a finding that he was able to represent himself, that he is — that he will be allowed to represent himself in pro. per." The trial court granted the prosecutor's request to incorporate into the record the questionnaire that defendant had filled out when he previously requested and was granted self-representation.

The United States Supreme Court has construed the federal Constitution's Sixth Amendment, which guarantees "the assistance of counsel" to an accused in a criminal prosecution, to also guarantee a right of self-representation. (*Faretta v.*

*California* (1975) 422 U.S. 806, 834.) The right applies in both capital and noncapital prosecutions. (*People v. Taylor*, *supra*, 47 Cal.4th 850, 865-866.) To exercise the right, a defendant must make a voluntary, knowing, and intelligent waiver of the right to counsel. (*People v. Butler* (2009) 47 Cal.4th 814, 824; *People v. Burgener* (2009) 46 Cal.4th 231, 240-241.) "On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel." (*People v. Burgener*, at p. 241.)

Here, the record shows that defendant chose self-representation with an understanding of the risks involved, the nature and seriousness of the crimes for which he would be sentenced, and his right to continue being represented by counsel. Having previously experienced both self-representation and representation by counsel, defendant necessarily understood what each form of representation involved as well as his right to continue with the attorneys who had represented him throughout the trial. His attorney affirmed that defendant had always seemed able to understand the courtroom proceedings, a view that was consistent with the trial court's own observations of defendant throughout the proceedings. The trial court advised the defendant that his choice of self-representation was unwise and that preparation and submission of a motion for a new trial might be necessary to preserve certain issues for appellate review. The trial court also appointed advisory counsel for defendant and arranged for her to meet with defendant well in advance of the sentencing hearing, to ensure that defendant understood what needed to be done to prepare for that hearing. Given defendant's familiarity with trial proceedings, and with both self-representation and representation by counsel, further advisements regarding the perils of self-representation were not required. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1070 ["No particular form of words is required in admonishing a defendant who

seeks to waive counsel and elect self-representation . . . ."]; *People v. Pinholster* (1992) 1 Cal.4th 865, 928-929.)  We conclude that defendant's waiver of the right to counsel was voluntary, knowing, and intelligent.

As explained earlier (see, *ante*, at pp. 60-61), the trial court did not err in failing to suspend criminal proceedings to determine defendant's competence to stand trial.  We likewise conclude that the trial court properly found defendant competent to represent himself at sentencing without counsel.  (See *People v. Taylor*, *supra*, 47 Cal.4th 850, 879 [at time of defendant's trial, under state law, competence to defend oneself and competence to stand trial were determined by the same standard].)  Although defendant's apple-throwing incident (see, *ante*, at p. 58) showed that he sometimes had difficulty controlling his anger and frustration, the record contains no indication of serious mental deficiency or illness.

### H.  Constitutionality of Death Penalty Law

Defendant contends that California's death penalty law violates the federal Constitution in various ways.  As discussed below, we have repeatedly considered and rejected each of these constitutional challenges.  We do so again here.

California's death penalty law, which permits capital punishment for many first degree murders, including unintentional felony murders, is not overly broad. (*People v. Bacon*, *supra*, 50 Cal.4th 1082, 1129; *People v. Boyer* (2006) 38 Cal.4th 412, 483.)

Section 190.3, factor (a), which allows the jury to consider the circumstances of the crime, does not result in the arbitrary or capricious imposition of the death penalty.  (*People v. Moore* (2011) 51 Cal.4th 386, 415; *People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

75

The death penalty law is not rendered unconstitutional by the absence of a requirement that the jurors unanimously agree on aggravating circumstances, or by the absence of a requirement that aggravating circumstances be proved beyond a reasonable doubt. (*People v. Moore*, *supra*, 51 Cal.4th 386, 415.) The United States Supreme Court's decisions in *Apprendi v. New Jersey* (2003) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not alter that conclusion. (*People v. Moore*, *supra*, at pp. 415-416; *People v. Lewis*, *supra*, 43 Cal.4th 415, 534.) The jury's consideration of the defendant's unadjudicated criminal activity as an aggravating circumstance is constitutionally permissible, and the jury need not agree unanimously that the defendant committed the unadjudicated crimes. (*People v. Booker*, *supra*, 51 Cal.4th 141, 196; *People v. Loker* (2008) 44 Cal.4th 691, 756.)

The federal Constitution does not require "that the trial court instruct the jury that it must find beyond a reasonable doubt that aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty." (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533; accord, *People v. Bacon*, *supra*, 50 Cal.4th 1082, 1129.)

A jury's death verdict need not be based on written findings regarding aggravating factors. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533-534.) "The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution." (*People v. Bacon*, *supra*, 50 Cal.4th 1082, 1129.)

The use of the restrictive adjectives "extreme" and "substantial" in section 190.3's list of potential mitigating factors does not unconstitutionally inhibit the jury's consideration of mitigating evidence or make the factors impermissibly vague. (*People v. Booker*, *supra*, 51 Cal.4th 141, 197; *People v. Lewis*, *supra*, 43 Cal.4th 415, 532.)

The trial court is not constitutionally required to instruct the jury that certain sentencing factors can only be mitigating. (*People v. Booker*, *supra*, 51 Cal.4th 141, 197.)

The standard instruction given in this case telling the jury how it is to weigh the aggravating and mitigating evidence (CALJIC No. 8.88) accurately and adequately describes the jury's sentencing discretion and the deliberative process for determining the penalty verdict. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 533-534.)

California's death penalty law does not violate the federal Constitution's equal protection guarantee by denying capital defendants procedural safeguards that are available to defendants charged with noncapital crimes. (*People v. Loker*, *supra*, 44 Cal.4th 691, 756.)

The federal Constitution does not require that the trial court instruct the jury that life imprisonment without possibility of parole is presumed to be the appropriate penalty unless the prosecution proves to the contrary. (*People v. Lewis*, *supra*, 43 Cal.4th 415, 534.)

## I. Length of Appellate Process

Contrary to defendant's contention, the delay between sentence and execution required to complete the appellate process does not violate the federal or state Constitutions. (*People v. Booker*, *supra*, 51 Cal.4th 141, 197; *People v. Seaton*, *supra*, 26 Cal.4th 598, 702.)

## J. International Law

We reject defendant's claim that the death penalty as administered in California violates international law or international norms. (*People v. Booker*, *supra*, 51 Cal.4th 141, 197; *People v. Gutierrez* (2009) 45 Cal.4th 789, 834; *People v. Lewis*, *supra*, 43 Cal.4th 415, 539.)

77

## V. ADEQUACY OF APPELLATE RECORD

Defendant contends that errors and omissions in the appellate record have denied him his right to a meaningful appeal. We disagree.

Under the due process and equal protection clauses of the federal Constitution's Fourteenth Amendment, and under state law, a criminal defendant is entitled to an appellate record that is "sufficient to permit adequate and effective appellate review." (*People v. Rogers*, *supra*, 39 Cal.4th 826, 857; accord, *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 195; *People v. Galland* (2008) 45 Cal.4th 354, 370.) "The defendant has the burden of showing the record is inadequate to permit meaningful appellate review." (*People v. Rogers*, at p. 858; see *People v. Taylor*, *supra*, 48 Cal.4th 574, 659.)

Defendant asserts that the record is deficient in four respects, which we consider in turn.

### A. Jury Instruction Conference

Defendant points out that the appellate record does not include a reporter's transcript of a conference in which the trial court and counsel discussed proposed jury instructions for either the guilt phase or the penalty phase. Defendant insists that the transcripts are missing, but he presents no evidence that any such conference ever occurred. Notably, the trial court's minute orders do not show that any such conference occurred, nor do the reporters' transcripts of the oral proceedings at trial contain any mention by the trial court or by counsel of a jury instruction conference. Although we recognize that such conferences commonly occur, particularly in capital cases, defendant has not carried his burden of showing that any occurred in this case.

Were we to assume that such conferences were held but were not reported or transcribed, the absence of such transcripts would not establish a denial of

defendant's right to an adequate record. The appellate record contains a complete record of the jury instructions that were given, as well as copies of proposed instructions that the trial court rejected. We have considered on its merits each of defendant's claims of instructional error, and we have not rejected any of those claims on the ground that defendant failed to object to the instruction or failed to propose appropriate additional instructions. (See *People v. Seaton*, *supra*, 26 Cal.4th 598, 699.) The absence of transcripts of jury instruction conferences has not deprived defendant of meaningful appellate review. (See *People v. Letner and Tobin*, *supra*, 50 Cal.4th 99, 195; *People v. Rundle* (2008) 43 Cal.4th 76, 111-112.)

## B. Self-representation Evaluation and Hearing

As already stated (see, *ante*, at p. 72), after defendant was first charged with the murder of Patrick Rooney, he briefly exercised his right of self-representation. The prosecution later dismissed and refiled the charges in a different judicial district, and court proceedings recommenced. The appellate record includes some documents relating to the original prosecution, including an order appointing a psychologist to examine defendant to determine his competence to represent himself, but it does not include a report from the psychologist, nor does it include a transcript of the hearing at which the trial court granted defendant's request for self-representation. Defendant contends that he has been prejudiced by these omissions, particularly in light of the trial court's comment, when it granted defendant's presentencing request for self-representation, that it was relying in part on "the fact that another judicial officer on a previous occasion made a finding that he was able to represent himself."

The court's order of appointment stated that the psychologist was to furnish a report "only to the court in camera" and the court's minute order similarly stated

79

that the psychologist was "appointed to examine the defendant and to provide a confidential report to the Court only." It is unclear whether any report was ever made or whether any hearing on the motion for self-representation was ever held. In any event, defendant has failed to show he was prejudiced by the alleged omissions. When it granted defendant's presentencing motion for self-representation, the trial court placed minimal reliance on the earlier determination that defendant was competent to represent himself. The existing appellate record is adequate to provide meaningful review of defendant's claim that the trial court erred in granting his motion for self-representation.

## C. Challenge to Panel of Prospective Trial Jurors

Defendant asserts that a written motion challenging the manner in which jurors were selected in Los Angeles County, and the transcript of a hearing on that motion, have been omitted from the appellate record. Defendant fails to show, however, that any such motion was ever filed or any such hearing was ever held.

At the outset of jury selection proceedings, Defense Counsel Ramirez told the trial court that he was "considering filing a challenge to the petit panel" and asked when the court would hold a hearing on that challenge. The court indicated that the proper time would be the following Monday. The appellate record contains a reporter's transcript of proceedings on the following Monday, but that transcript does not include a hearing on a challenge to the jury panel, nor is such a hearing mentioned in the minute order for that date.

As evidence that the motion was filed, heard, and denied, defendant quotes remarks by the trial court later during jury selection. In response to defense counsel's complaints about the low number of African-Americans on the jury panel, the court said: "I can't control that. And that part, as far as challenge to the panel, is behind us." The court's remark is reasonably interpreted, however, as

80

meaning only that defendant's opportunity to challenge the panel had passed without any challenge having been made.

### D. Attorney's Request for Appointment as Defendant's Counsel

Attorney Angela Wallace represented defendant during the preliminary hearing on the complaint, but at the arraignment on the information the trial court declined to reappoint her. The court stated that there was "a letter in the file" from Wallace requesting the appointment. Defendant asserts that he has been denied meaningful appellate review because Wallace's letter requesting reappointment is not part of the appellate record.

Defendant has not shown that the omission of Wallace's letter from the appellate record prevents meaningful appellate review of any claim. The record before us includes the trial court's explanation, which was essentially that Wallace lacked the required experience. Among other things, the court said that it "would under no circumstances appoint an attorney on a capital case with less than ten years' admission to the bar." Attorney Wallace then addressed the court, but did not dispute the court's statements about her experience. The appellate record is adequate to review any claim regarding the failure to reappoint Wallace, and defendant does not explain how the letter could be relevant to any other potential claim.

### E. Disorganization of Appellate Record

Defendant complains that the appellate record is not entirely in chronological order, that it contains duplicate copies of some documents, and that other documents in the record appear to be unrelated to this case. Appellate counsel asserts that this disorganized condition has required additional time to sort through it and identify potential claims. We agree that the appellate record is not as well organized as it should be, and that these deficiencies have imposed added

81

burdens on appellate counsel and on this court.  Defendant has not, however, carried his burden of showing that the record's condition has prevented meaningful appellate review of any claim.

## VI.  DISPOSITION

The judgment is affirmed.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Elliot
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**
_____

**Opinion No.** S027094
**Date Filed:** February 2, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert W. Armstrong
_____

**Counsel:**

Richard B. Mazer, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Sharlene Honnaka, Joseph P. Lee, Thomas C. Hsieh and James William Bilderback, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard B. Mazer
Law Offices of Richard B. Mazer
99 Divisadero Street
San Francisco, CA  94117
(415) 621-4100

James William Bilderback
Deputy Attorney General
300 South Spring Street, Suite 5000
Los Angeles, CA  90013
(213) 897-2049