Filed 11/14/22 P. v. Snow CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079776 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS205658) |
| EDWARD LEROY SNOW, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, David M. Rubin, Judge. Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lise Jacobson and Daniel Rogers, Deputy Attorneys General for Plaintiff and Respondent.

In 2006, Edward Leroy Snow worked as a tow truck driver for Paxton's Towing (Paxton's).[1]  While on leave to purportedly care for an ill relative, he stole $80,000 from Paxton's during a robbery in which the night dispatcher, David S., was shot and killed.  A few days later Snow told an accomplice, "Old Dave never seen it coming."  A jury convicted Snow of first degree murder, and this court affirmed the judgment.  (*People v. Snow* (Sept. 19, 2012, D058200) [nonpub. opn] (*Snow I*).)

Now a decade later, Snow appeals from an order denying his petition for resentencing under former Penal Code[2] section 1170.95 (now § 1172.6).  He contends that applying independent review, we should reverse because there was insufficient evidence to support the court's finding that he acted with reckless indifference to human life.  We reject his claims and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

A.  *The Robbery and Murder*

Paxton's is owned by Larry L., who in addition to that business also operated food stands at home improvement stores.  The concession stands generated a sizeable cash flow, mostly in small bills.  About twice a week, Larry collected that money and stored it in bags under his desk at Paxton's.  Typically near the end of each month, he would dump the accumulated cash on his desk and count it.

---

[1]  Dates are in 2006 unless otherwise specified.

[2]  Undesignated statutory references are to the Penal Code.

[3]  The factual background is based exclusively on the reporter's transcript from Snow's murder trial.  We have not considered the Attorney General's statement of facts in his brief, which is instead (and improperly) based on facts recited in *Snow I*.  (See § 1172.6, subd. (d)(3).)

Paxton's employees knew large sums of cash were kept under Larry's desk. In August, Snow told a fellow tow truck driver, James Myers, "how easy it would be to rob Paxton's." Elaborating, Snow said that the night dispatcher, David S., could be "bopp[ed]" on the head and locked in a toilet during a robbery. He promised Myers a share of the proceeds if he and another tow truck driver, Terry Taylor, stayed away from Paxton's on the night he planned to commit the robbery.

About the same time, Snow took a leave of absence from Paxton's, purportedly to care for an ill relative in Kansas. On September 18, he returned to San Diego in a Dodge van and met with Taylor to discuss the robbery. Snow said he was "going to have two other people come in, grab [David S.], [and] put him in the port-a-potty." Snow explained he was "thinking about" shutting off the power to Paxton's and asked Taylor for the location of the main power switch.

Paxton's premises was secured by a barbed wire fence, two gates with remote controlled electric locks (one for pedestrians, the other for vehicles), and 16 surveillance cameras. There was even a hidden camera in the clock in Larry's office. To enter the facility, a person had to first identify themselves to the dispatcher (e.g., as the registered owner of a towed car). If the person belonged in the yard, the dispatcher would "buzz" them in, unlocking the pedestrian gate. Video from the surveillance cameras was recorded by equipment on the premises 24 hours/day, seven days a week.

On September 20—the day of the planned robbery—Snow again met with Taylor, this time to buy methamphetamine. As the conversation turned to the robbery, Snow showed Taylor a handgun and reminded him to keep quiet about it.

David S. was working alone in dispatch that night. Myers and Taylor were the only tow truck drivers on duty. Sticking to plan, they stayed away from the yard.

A surveillance camera at a neighboring business recorded a vehicle approach the locked Paxton's gate at 9:13 p.m. Notably, its third brake light (in the rear window) was not working. It stopped for about 15 seconds and then entered the yard. Seven minutes later, all the lights at Paxton's went off. At 9:21 p.m., the vehicle exited.[4]

At about 9:30 p.m., Taylor called David S. by telephone and when there was no answer, by two-way radio. But again, there was no response. He and Myers returned to Paxton's about 20 minutes later. The vehicle gate, ordinary locked closed, was wide open. The door to Larry's office had been forced open. About $80,000 in cash was missing. So was the video recorder.

Taylor and Myers found David S. on the ground near the dispatch office, dead. He had two gunshot wounds, one to the neck and the other in the head, about five inches above the right ear. Soot found near the neck wound indicated the shot was fired from close range. The neck wound may have been survivable, but the head shot was not. Bullet fragments were found in the brain. The next day Taylor confronted Snow about David's death. Snow replied, "We had to do it."

Snow fled to Kansas after robbery. He bragged about living like a "king," watching his new 52-inch television.

In October, police executed a search warrant at Snow's home in Kansas. They found a bag in his bedroom with $25,000 in small bills.

---

[4] The same vehicle returned at 9:25 p.m., drove through the still open gate, and then exited one minute later. At trial, the prosecutor theorized that Snow and his accomplices had first shot David S. in the neck and returned to make sure he was dead by shooting him again in the head.

Another $8,400 was found in his pants pockets. Some of the bills had distinctive pencil marks, which Larry identified as marks he made while counting the money. Police also seized Snow's Dodge van. Its rear window brake light was inoperable.

B.    *Snow's Petition for Resentencing*

At Snow's trial the court instructed the jury on malice aforethought murder as well as felony murder (CALCRIM Nos. 520, 540A, 540B). After a nine-day trial, the jury found Snow guilty of first degree murder. Under the Three Strikes law, the court sentenced him to prison for 50 years to life.

In 2019, Snow filed a petition for resentencing under what is now section 1172.6. The matter was assigned to judge David M. Rubin, who had presided over Snow's trial. After issuing an order to show cause, the court conducted an evidentiary hearing. Neither side offered new evidence. The court read the reporter's transcript from the murder trial, the appellate opinion in *Snow I*, and the parties' points and authorities.

In a detailed 17-page decision, the court denied the petition. Although the court was not persuaded that Snow was the "actual killer," it found beyond a reasonable doubt that he "acted as a major participant committing the robbery while acting with reckless indifference to human life . . . ." Focusing on the "reckless indifference" element, the court elaborated:

> "Here, [Snow] acted with reckless indifference to human life. [Snow's] statements that 'old Dave never saw it coming' and 'I had to shoot him' show he did not care about [David S.'s] safety during the crime. The speed with which the crime occurred . . . shows the decision to kill [David S.] was quick, and little to no effort was made to stop it. [Snow] used his familiarity with [David S.] to gain [his] trust to let [Snow] into the tow yard. [Snow] was present at the crime scene and the architect of the burglary and

5

robbery plan. The scheme included no effort to minimize the violence to [David S.] . . . ."

## DISCUSSION

A.  *Section 1172.6 Framework*

Effective January 1, 2019, Senate Bill No. 1437 amended the felony-murder rule by adding section 189, subdivision (e). It provides that a participant in the qualifying felony can be convicted of felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. (See *People v. Gentile* (2020) 10 Cal.5th 830, 842.) The Legislature also amended the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.)

Under section 1172.6, persons convicted of felony murder or murder based on the natural and probable consequences doctrine may petition the sentencing court to vacate their convictions and be resentenced on any remaining counts if they could not have been convicted of murder because of these statutory changes. (See *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

Where, as here, the petition states a prima facie case for relief, the superior court is required to conduct an evidentiary hearing. At that hearing, the prosecution must prove beyond a reasonable doubt that the petitioner is guilty of murder, attempted murder, or manslaughter under amended sections 188 and 189. (§ 1172.6, subd. (d)(3).) The trial court acts as factfinder and determines whether the prosecution has met its burden.

6

(*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).) "If the prosecution fails to sustain its burden of proof, the prior conviction . . . shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3); see *People v. Lamoureux* (2019) 42 Cal.App.5th 241, 249.)

B.    *The Substantial Evidence Standard of Review Applies to Trial Court Findings Under Section 1172.6, Subdivision (d)(3)*

In reviewing trial court findings under section 1172.6, an unbroken line of authority has applied the substantial evidence standard of review. (See, e.g., *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); *People v. Garrison* (2021) 73 Cal.App.5th 735, 747; *Ramirez, supra,* 71 Cal.App.5th at p. 985; *People v. Williams* (2020) 57 Cal.App.5th 652, 663; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.) Snow nevertheless maintains that we should review the evidence independently. Citing primarily *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), he contends that deference to a trial court's findings is inappropriate when those findings are "based on a cold record."

Snow's argument is undermined by *Clements,* which rejected an identical claim. (*Clements*, *supra,* 75 Cal.App.5th at p. 301.) The *Clements* court noted that in the analogous context of a Proposition 36 petition for resentencing, " '[E]ven if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings.' " (*Ibid.*) Similarly here, the trial court's ruling turns on a question of fact—whether Snow acted with reckless indifference to human life.

Contrary to Snow's assertions, *Vivar* does not change this analysis. That case involved a motion to vacate a conviction under section 1473.7.

Under that statute, a person is entitled to relief if the trial court finds there was prejudicial error affecting the person's ability to meaningfully understand the immigration consequences of a criminal plea. (*Vivar, supra,* 11 Cal.5th at pp. 527–528.) The court in *Vivar* concluded that independent review was appropriate, in part because (1) the issues involved in a section 1473.7 motion "are predominantly questions of law"; and (2) "the judge adjudicating the resulting motion may never have participated in any of the underlying proceedings and must rely entirely on a cold record." (*Vivar,* at pp. 524, 526–527.)

But here, and unlike in *Vivar,* whether Snow acted with reckless indifference to human life is a quintessential question of fact. (See *People v. Clark* (2016) 63 Cal.4th 522, 618 (*Clark*).) Moreover, *Vivar* is expressly limited to section 1473.7 motions, and did not "disturb[ ] [the] familiar postulate" that " 'an appellate court should defer to the factual determinations made by the trial court' " regardless of whether such findings were based on oral testimony or declarations. (*Vivar, supra,* 11 Cal.5th at p. 528, fn. 7.) Indeed, Snow's case is also materially distinguishable from *Vivar* because the trial judge deciding his 1172.6 petition also presided at his trial. Thus, unlike *Vivar,* factual determinations made in his petition for resentencing cannot be said to have been made on a "cold record."[5]

Accordingly, the substantial evidence standard of review applies in this case. We review the entire record in the light most favorable to the order to determine whether it contains evidence that is reasonable, credible, and of

---

[5] Cases cited by Snow involving the standard of review in original proceedings for habeas corpus are also inapposite. (*Vivar, supra,* 11 Cal.5th at p. 537 (conc. & dis. opn. of Corrigan, J.) ["[w]e should be hesitant here to uncritically apply a habeas corpus standard of review to appellate review of statutory claims"].)

solid value from which a reasonable trier of fact could find beyond a reasonable doubt that in committing the robbery, Snow acted with reckless indifference to human life. (See *People v. Elliott* (2013) 53 Cal.4th 535, 585.)[6]

C.     *Substantial Evidence Supports the Finding of Reckless Indifference to Human Life*

Snow is not entitled to resentencing under section 1172.6 if he was "a major participant" in the robbery and acted with "reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2." (Pen. Code, § 189, subd. (e)(3); see § 1172.6, subd. (a).) Snow's brief challenges only the "reckless indifference" prong. He concedes there was evidence that he "helped plan" the robbery, was present during it, and that his familiarity with David S. allowed the robbers "to gain entry to Paxton's." But he maintains there was insufficient evidence to support a finding of reckless indifference because there was "no evidence" that he was armed, used a gun, or that the fatal shot came from a handgun "rather than a rifle or shotgun." He further maintains that the plan was not to kill, but only to lock David S. in the bathroom, indicating that he was "unaware of the gun and potential for risk to [David S.'s] life."

" '[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) "[I]t encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically

---

6     The Attorney General's brief does not address Snow's argument that an independent standard of review applies. In light of *Vivar*, it is not a frivolous argument and a response from counsel for the People would have been prudent.

9

desire that death as the outcome of his actions." (*In re Bennett* (2018) 26 Cal.App.5th 1002, 1021.) There is both a subjective and objective component. (*Clark*, *supra*, 63 Cal.4th at p. 617.) Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." (*People v. Banks* (2015) 61 Cal.4th 788, 801.) As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, *supra*, 63 Cal.4th at p. 617.) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement. (*Banks*, at p. 808.) That a participant or planner of an armed robbery could reasonably anticipate lethal force might be used is not sufficient to establish reckless indifference to human life. (*Ibid.*)

Contrary to Snow's assertions, substantial evidence supports the court's finding that he acted with reckless indifference to human life. Initially, the record belies his claim that there was "no evidence" he was armed. On the day of the robbery, Snow showed his handgun to Taylor. Snow is also incorrect in claiming there is no evidence that the wounds were "consistent with the use of a handgun rather than a rifle or shotgun." The medical examiner testified that the fatal bullet was "certainly consistent with a handgun. It does not look like a shotgun and does not look like a rifle."

As to the subjective element of reckless indifference, Snow's remark, "Old Dave never saw it coming" and "[w]e had to do it" suggest an intent to kill. At a bare minimum, they betray a calculated and callous disregard for life, the very hallmark of reckless indifference.

Objectively too, there is ample evidence to support the court's finding. The crucial issue is the degree of risk to human life. (*In re Scoggins* (2020) 9 Cal.5th 667, 682 (*Scoggins*).) The day before the robbery, Snow was armed with a handgun. Anticipating that robbing Paxton's would be met with resistance from David S., the supposed plan—to hit him on the head with sufficient force to cause a loss of consciousness—posed a serious risk of violent confrontation from the very outset. Indeed, a reasonable if not inescapable inference is that the real plan was always to kill. The robbery's success depended first and foremost on getting into the locked tow yard after regular business hours. And that meant David S. had to *recognize* Snow and based on that familiarity open the locked security gate. Thus, Snow could not disguise his appearance, and surely he did not want to be identified and caught. The theft of the surveillance video and recording equipment can only be explained as Snow's appreciation of the risk of identification.

It would have been pointless to, in effect, silence the electronic witness but not David S. This is likely what Snow meant when he told Taylor the next day, "We had to do it." Or perhaps more to the point given the applicable standard of review, that the plan involved an extremely high risk that the night dispatcher would be killed is a more-than-reasonable inference from the evidence. (See *Scoggins, supra*, 9 Cal.5th at p. 676 [reckless indifference to human life where, for example, " 'the robber . . . shoots someone in the course of the robbery, utterly indifferent to the fact that the

11

desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property"].)

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.